STATE OF WEST VIRGINIA

*v.*

JOHN EDWARD WILLIAMS

(No. 13746)

Decided December 5, 1978.

*Phillips, Holden, Marshall & Gardill and James C. Gardill, Schrader, Stamp & Recht and Michael J. Moyle* for plaintiff.

*Chauncey H. Browning*, Attorney General, *William D. Highland*, Assistant Attorney General, for defendant.

McGRAW, JUSTICE:

This is an appeal by John Edward Williams from a final judgment of the Circuit Court of Marshall County sentencing him to imprisonment for life, without a recommendation of mercy, following a jury verdict of guilty of first degree murder in violation of W.Va. Code § 61-2-1. The defendant relied unsuccessfully on the defense of insanity at trial.

The most critical assignment of error[1] relates to the trial court's denial of a pretrial motion to suppress certain evidence, namely, a watch bearing the victim's initials, and all inculpatory statements made by the accused. Based on *State v. Thomas*, ____ W.Va. ____, 203 S.E.2d 445 (1974), it is contended that the defendant did not freely and voluntarily consent to the search of his jacket within which the watch was found but merely acquiesced to the demand of the police to hand over his jacket. In addition, the defense asserts that all of the defendant's inculpatory statements or confessions were obtained directly as a result of that illegal search, and therefore, are inadmissible as "fruits of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed.2d 441 (1963). The defense also asserts the trial court erred in admitting in evidence the defendant's boots, because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed.2d 694 (1966). We agree.

_____

[1] The Court has also considered all the other assignments of error, including: (1) the ability of a person of subnormal intelligence to knowingly and intelligently confess or waive constitutional rights; (2) the propriety of the insanity defense instructions relating to the disposition of persons found insane; (3) the noncompliance by the State with the Bill of Particulars; (4) the introduction of evidence previously ruled inadmissible into the jury room during the course of deliberations; and (5) the denial of a change of venue. The Court finds these assignments do not have sufficient merit to warrant discussion, particularly in light of the disposition of the case on other issues.

Because the defense placed primary emphasis during the suppression hearings on its challenges to the voluntariness of all statements made by accused and its claim that the accused lacked the mental capacity to intelligently and knowingly waive his *Miranda* rights, the bulk of the suppression testimony relates to these issues. We now turn to the pertinent facts developed in those hearings, particularly the facts surrounding the initial apprehension and subsequent interrogation of the accused, followed by a discussion and application of the controlling constitutional principles relating to consent searches.

At approximately 1:25 a.m., in the early morning hours of February 28, 1974, five police officers went to the defendant's home without a warrant. Since the defense did not contend below that the defendant was illegally arrested, the record does not indicate precisely how the police gained entrance to his residence. In any case, three officers entered the residence while a fourth officer was instructed to watch the back door of the house to make certain no one escaped.

Upon entry the police found the defendant asleep in a chair and, although he had been drinking, the officers uniformly testified that he was not drunk. Before the administration of *Miranda* warnings, a police officer questioned the defendant concerning the shoes he was wearing. The record, although not as complete as would be desirable, supports the conclusion that the defendant upon questioning then informed the officers where he had purchased the new shoes and where he had left his old shoes. (Thereafter, the police located the shoes, subjected them to chemical analysis and, at trial, introduced them as circumstantial evidence of the defendant's presence at the scene of the crime based on the presence of blood stains on the abandoned shoes. Again, whether the blood stains on the shoes were compatible with the blood type of the samples taken at the crime scene does not clearly appear from the record.)

The defendant was taken by the arm and escorted toward the doorway, and the officers on the front porch were instructed to keep the defendant outside on the porch. While on the porch, one of the officers kept a hand on the defendant at all times. While the defendant was detained on the front porch, the officers inside talked to the defendant's foster parents and obtained from them the clothing he was wearing the preceding day—the day of the murder. In the pretrial suppression hearing, the police officers testified in essence that the defendant, of his own free will, accompanied the officers to the police barracks; that he was not placed under arrest at his home; that the "investigation up until that time led us to suspect Mr. Williams"; that the defendant "possibly was a suspect"; and that "he was just someone we were interested in talking to at this time."

Once in the police cruiser, one officer testified that the defendant was informed that the police were investigating two murders and that *Miranda* warnings were then given. Yet, another officer testified that while enroute to the police station, the defendant repeatedly asked "what's the matter."

Upon arrival at the police barracks, the defendant was given a detailed explanation of his *Miranda* rights and, because the police were aware of his limited intelligence every effort was made to ensure he understood his rights. The officers indicated that the defendant stated that he understood what his rights were and that he agreed to speak to them. Shortly after arriving at the station, the police officers asked the defendant if he would mind showing them what was in his pants pockets and he did so. Later, the officers searched the defendant's jacket and found in the lining a watch bearing the victim's initials. The defendant had not made any inculpatory statements concerning his role in the crime until, with five officers present, he was confronted with the telltale watch. Thereupon, he admitted playing a minor role in the crime and agreed to accompany the officers to the crime scene. Upon return to the station, a

second admission or confession of the defendant was taped. Thereafter, on March 1, 1974, a third tape recorded statement was taken, followed by two more taped statements on March 3, 1974, and March 8, 1974, respectively. We note that approximately 9:30 p.m. on March 1, 1974, defendant and his accomplice, Paul Moore, were placed in the same room and confronted with the statements each had already given. At this point the defendant said that he didn't wish to make any statement until he talked to a lawyer.

The defendant's suppression testimony was that he was drunk and asleep in a chair the night he was taken into "custody", that he had been drinking regularly for the preceding three (3) weeks and had previously been hospitalized for his drinking problems; that he could not read or write except for his own name; that he never completed elementary school; that on prior occasions he had been arrested for criminal offenses; that he didn't remember seeing any of the written transcriptions of his statements given to the police despite his signature appearing on some of them; that after being questioned for a time at the state police barracks he was "smacked in the face" by a member of the Department of Public Safety and thereafter was taken to a county facility; that when the police confronted him with his accomplice he was repeatedly asked if he had anything to say despite his requests for counsel; that he did not understand his constitutional rights; that he talked to the police because he was afraid of them after being hit; and that he feared he would be taken back to the state police barracks and further abused because one of the officers kept saying we might as well take him back over to the state police barracks.

The State contended in the suppression hearings that the defendant consented to go to the police barracks and consented to the search of his jacket containing the victim's watch. A Trooper Dickinson testified that he requested the other officers to check to see if there was

anything in the defendant's jacket. The officer who obtained the jacket from the defendant testified that he did so by stating: "John, let me have your jacket. I'll take it here in the other room .... You won't need it in here anyhow." Later, his testimony was that he asked, "do you mind if I look through your jacket? Do you mind taking it off so we can look through it?" and the defendant simply responded "no" and gave him the jacket. That officer was asked at one point, "Did the defendant consent to let you take the jacket," and his response was, "yes, there was no objection." The subsequent search took place in another room without the defendant's knowledge. Finally, one officer testified that when the defendant was asked if he would explain his possession of the watch he said something like, "I might as well tell you all about it."

## I

Although there may be some uncertainty concerning the theoretical underpinnnings for consent searches under the Fourth and Fourteenth Amendments,[2] it is well established that the search and seizure conducted by police is not unlawful or unreasonable, notwithstanding the absence of probable cause and a search warrant, where the search is voluntarily consented to, syl. pt. 1, *State v. Basham*, ____ W.Va. ____, 223 S.E.2d 53 (1976); syl. pts. 8 & 9, *State v. Thomas*, ____ W.Va. ____, 203 S.E.2d 445 (1974); syl. pt. 4, *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973), *citing*, syl. pt. 1, *State v. Angel*, 154 W.Va. 615, 177 S.E.2d 562 (1970); provided, the consenting person has the authority to consent, *see, e.g.*, *State v. Hacker*, ____ W.Va. ____, 209 S.E.2d 569 (1974) (consenting third party not shown to have common authority over defendant's living quarters.)

---

[2] *Compare Stoner v. California*, 376 U.S. 483, 84 S. Ct. 889, 11 L. Ed.2d 856 (1964), speaking of consent as a waiver *with Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed.2d 854 (1973), focusing on the element of express or implied coercion; *see* A. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, nn.102-03.

"[W]hether a consent to a search [is] in fact 'voluntary' or [is] the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances," *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047:48, 36 L. Ed.2d 854, 862-63, (1973) (noncustodial search of automobile), and while knowledge of the constitutional right to refuse consent to search is one factor, such knowledge is not an essential prerequisite which must be proven by the government as "the *sine qua non* of an effective consent." *Id.* at 227, 93 S. Ct. 2048, 36 L. Ed.2d 863; *accord*, syl. pt. 2, *Basham, supra*.

Where the State relies upon consent to justify the unlawfulness of a search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed.2d 797 (1968), and in *Hacker, supra*, we held in the syllabus that the State must prove by a preponderance of evidence that a warrantless search was legal.

In *State v. Thomas, supra*, this Court approved and adopted the principle that there is a heightened possibility of coercion where the alleged consent was made by a person in custody. Syllabus point 9 states:

> A suspect whose acquiescence to search is secured during police custody occurring by reason by an illegal arrest, or similar form of overt or subtle detention, is in no position to refuse to comply with the demands of the officer in whose custody he is, whether such demand is couched in the language of a polite request or direct order, and he cannot be held to have consented to the search voluntarily.

We reaffirm that principle here. The history of the law of confessions supports the conclusion that custodial interrogations are inherently coercive, and an alleged consent to search given under such circumstances must be subjected to the most careful scrutiny, *See, e.g., Judd v. United States*, 89 U.S. App. D.C. 65, 190 F.2d 649 (1951). Now to the present case.

Although the defense did not contend that the defendant was illegally arrested,[3] we conclude the defendant was being detained within the meaning of *Thomas* and its principles are applicable.[4]

In addition to the inherently coercive aspects of custody, the facts surrounding the apprehension and interrogation clearly indicate the defendant merely acquiesced to police demands in relinquishing possession of the jacket. Five police officers essentially surrounded the home of the accused in the middle of the night. Upon arrival at the police barracks, the accused was treated as if he were under arrest and was requested to empty his pockets. The suppression testimony warrants the conclusion that police intended to search the defendant's jacket and thereby invade his privacy, and that any objection on his part would have been futile.

The intelligence of a person allegedly consenting to a search is a factor to be considered in determining the voluntariness of a consent search. On this point, a clinical psychologist testified in the suppression hearings that the defendant had a full scale intelligence quotient of sixty (60), placing him, under the Wechsler Adult Intelligence Scale, in the mentally defective classification. The subnormal intellect of the defendant thus also points to mere submission to authority.

---

[3] Because the illegal arrest issue was not raised below and the record is insufficiently developed on this point, we decline to reach that question despite forceful argument of the State. The State confessed error and congently argued that the defendant was arrested without probable cause at his home and that the confessions of the accused, as well as his statements concerning his old shoes, were a product of the exploitation of an illegal arrest and are inadmissible under the principles enumerated in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L. Ed.2d 416 (1975) and *Commonwealth v. Barnette*, ___ Pa. ___, 369 A.2d 1180 (1977.

[4] Although we do not wish to imply that a person in custody can never effectively consent to a search, *see, United States v. Watson*, 423 U.S. 411, 96 S. Ct. 820, 46 L. Ed.2d 598 (1976) (consent on public street to automobile search following arrest held voluntary), a purported consent given during interrogation at a police station must be considered suspect.

Finally, the conclusion that the consent was not the product of free will is reinforced by the fact that the alleged consent to search was given at a time when the defendant still denied any involvement in the crime under investigation. As one court said, "no sane man who denies his guilt would actually be willing that police search his room for contraband which is certain to be discovered ... at least in the absence of some extraordinary circumstance, such as ignorance that contraband is present." *Higgins v. United States*, 209 F.2d 819, 820 (D.C. Cir. 1954).

We, therefore, are constrained to hold, considering the totality of the circumstances, that the defendant did not freely and voluntarily consent to the search of his jacket, and that the trial court erred in admitting the watch into evidence.

It is settled that where a confession is induced by illegally seized evidence, the confession must be excluded as "fruit of the poisonous tree." *See e.g., Fahy v. Connecticut*, 375 U.S. 85, 84 S. Ct. 229, 11 L. Ed.2d 171 (1963); *Wong Sun, supra; Annot.* 43 A.L.R.3d 385 (1972). The evidence of the State clearly demonstrates the defendant's first confession was made immediately after being confronted with the illegally obtained evidence and at a time when the defendant still denied any involvement in the crime. This confession was induced by the illegal search, was a product of the exploitation of that illegality, and therefore must be excluded.

The remaining confession question is whether the second and each succeeding extrajudicial confession are inadmissible as fruits of an unlawful search and seizure.

The proper rule is that where an accused makes a confession as a result of being confronted with illegally seized evidence, and upon subsequent questioning again confesses, there is a presumption that the second and each succeeding confession are the product of the first. The prosecution has the burden of showing by clear and substantial proof that the second and each subsequent

confession was made when the mind of the accused was free from the influence which induced the prior confessions. Absent such showing all successive extrajudicial confessions must be excluded. *Bunting v. Commonwealth*, 208 Va. 309, 157 S.E.2d 204 (1967); *People v. Johnson*, 70 Cal.2d 541, 75 Cal. Rptr. 401, 450 P.2d 865, *cert. denied*, 395 U.S. 969, 89 S. Ct. 2120, 23 L. Ed.2d 758 (1969); 7 M.J. *Evidence* § 228 (1976); 29 Am. Jur.2d *Evidence* § 537 (1967).

There is no evidence demonstrating a break in the causative link running between the confessions in this case. The State did not meet its burden, and we must presume each confession was the product of the preceding illegalities. The fact that *Miranda* warnings were given prior to each confession is not sufficient standing alone to purge the primary taint of the illegal search and seizure.[5] Had the defendant also been informed that the victim's watch and his first confession could not be introduced at trial against him in the State's case in chief, a different outcome might obtain as to the subsequent confessions.

We note again the subnormal intellect of the accused, and also that the accused was not presented to a magistrate until after his final confession some eight days after his initial arrival at police headquarters.

Finally, we consider the admissibility of the defendant's boots. The evidence of record on this issue is not well developed. It is undisputed that the defendant was questioned in his residence before *Miranda* warnings were given. We hold that the defendant was by no means free to go his merry way and was so restricted in his freedom at the time he was questioned in his home that the strictures of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed.2d 694 (1966), designed to secure the right to counsel and to remain silent, are applicable, and

---

[5] *People v. Johnson*, 70 Cal.2d 541, 75 Cal Rptr. 401, 450 P.2d 865, *cert. denied* 395 U.S. 969, 89 S. Ct. 2120, 23 L. Ed.2d 758 (1969); *Commonwealth v. Daniels*, 455 Pa. 552, 317 A.2d 237 (1974); *See Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed.2d 416 (1975).

the boots, having been located as a result of the defendant's responses, are inadmissible.

We wish to make clear that our holding on this point is not based on the premise that *Miranda* requires a police suspect be warned of his constitutional rights before he can be questioned. *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed.2d 714 (1976) (per curiam). Rather, this holding is based on the conclusion that the defendant's physical freedom had been restricted before questioning began to the extent that he was "in custody" for *Miranda* purposes.

For the foregoing reasons, the judgment of the Circuit Court of Marshall County is reversed and the case is remanded for a new trial.

*Reversed and remanded.*