STATE OF WEST VIRGINIA

*v.*

ROBERT H. RICKMAN

(No. 14844)

Decided June 9, 1981.

*Riley, Yahn & Cooey, Robert A. Yahn* and *W. Craig Broadwater* for appellant.

*Chauncey H. Browning,* Attorney General, *Silas B. Taylor,* Assistant Attorney General, for appellee.

MCGRAW, JUSTICE:

The appellant, Robert H. Rickman, was convicted in the Circuit Court of Marshall County of sexual assault in the first degree and was sentenced to a term of not less than ten nor more than twenty years in the West Virginia Penitentiary.

The appellant assigns only two errors here. He contends the circuit court erred in allowing the victim to make an in-court identification of the appellant because the pretrial

identification procedure used by the police to allow the victim to identify the appellant was unfairly suggestive. He also complains that the court erred in failing to suppress all evidence obtained from a search of the appellant's car because the consent to search the car was the result of coercive custodial circumstances.

We disagree with the appellant's contentions and upon review and consideration of the record, the briefs, and the arguments of counsel, we affirm the final judgment of the Circuit Court of Marshall County implementing the jury verdict returned in this case.

The victim, a small twenty-six year old woman, was on her way to visit her mother at Christmastide. After a long journey from South Carolina, she alighted from a bus. The night was dark and cold. She entered a bakery, ate, and tried to telephone home. No one answered so she set out for another establishment where she knew she could sit in safety and warmth until she could call her people to fetch her. On her way to that refuge, she was attacked, forced into a car, forced to commit fellatio, and carried to another place where she was forced to engage in sexual intercourse. In the transpiration of these events, she was battered, her jaw was broken in three places, her face was made to bleed, and she was threatened with mortal harm. After release, she ran into a lighted house, the police were called, and she was removed to a hospital for treatment.

The fact that the crime of sexual assault was committed is not in issue. The overriding issue is whether the appellant was the person who committed the assault. He denied the charge and testified that he did not know the victim, that he had never seen her until the police-arranged line-up on January 19, 1978, and that he was not in the area where the crime was committed on the night of December 26, 1977.*

---

* The appellant contends he did not know the victim, had never seen her until she viewed the police-arranged line-up of seven men on January 19, 1978, some 24 days after the date of the crime, and was otherwise elsewhere engaged on the night of December 26, 1977, when the crime was committed. One witness testified that Mr. Rickman was

The pre-trial identification procedure in question here began on January 3, 1978, when a deputy sheriff, in possession of a composite likeness of the assailant based upon the victim's earlier description of him, visited the victim at the hospital. Using the composite drawing and the victim's subsequent description, the deputy conducted an investigation which, with the help of an informant, led him to the appellant's place of employment. The deputy requested that the Moundsville Police bring the appellant to the police station so that the victim could view him. On January 6, at the police station, the appellant was told that there was some problem with his vehicle registration. While he was talking with the officers, the victim viewed him through a one-way mirror, but she was unable to positively identify the appellant as her assailant. She explained that she could not see his face clearly as he was wearing a hard-hat when she viewed him through the mirror, and that she needed a closer look. She also wanted to hear his voice. Later, she spent an hour at the station viewing police mug-shots but was unable to identify anyone as her assailant. On January 10, she was taken to Bellaire, Ohio, to see another man and a car fitting her descriptions, but she stated that he was not her assailant.

A week later the deputy asked the victim to examine ten photographs which he had put together from various sources not previously utilized. All the photographs were

at her home from about 9:00 o'clock p.m. on December 26 until after 11:00 o'clock p.m. on December 26, 1977. The deduction is that Mr. Rickman could not possibly have been the man committing the sexual assault on the victim shortly after 10:00 o'clock on the evening of December 26, 1977. The appellant's testimony avers that he went home about 11:30 that night. A police officer testified that the appellant related to him that he and a woman companion visited several clubs in the Wheeling area on the evening of the assault, and that he was with the woman companion "up until 1:30 or 2:00 o'clock in the morning". Documents filed with the bill of particulars, however, indicate the woman companion was in an automobile accident on the evening in question and was admitted to the Reynolds Memorial Hospital at 10:00 p.m. that night for attention to several injuries. She was released on December 30, 1977. This woman companion did not appear as a witness at the trial, although the record indicates she may have been subpoenaed.

of men approximating the victim's description of her assailant. From the photographs, she positively identified the appellant as her assailant. Two days later she was present at a line-up of seven men fitting her description of her assailant, including the appellant. Each man was asked to repeat a phrase which the assailant allegedly spoke to the victim. She positively identified the appellant as the perpetrator of the crime.

On the first day of the trial, the circuit court, in the absence of the jury, conducted evidentiary hearings on two suppression motions made by the appellant. A motion to suppress physical evidence obtained by police during a search of the appellant's residence was properly granted by the trial court based on the well-settled rule that an affidavit to establish probable cause is insufficient if it merely states the affiant's suspicion or belief. However, the trial court denied the appellant's motion to suppress the testimony of the victim identifying the appellant as her assailant. During trial the appellant also moved to suppress evidence obtained as the result of a search of his car, but the trial court denied this motion as well. The motions to suppress constituted, in substance, the grounds for the appellant's post-trial motion to set aside the jury's verdict. This motion was denied by the circuit court.

I

The appellant's first assignment of error is the circuit court's denial of the motion to suppress the testimony of the victim identifying the appellant as her assailant, and its refusal to set aside the verdict on that ground. The appellant contends that admission of this testimony violated his due process rights under the Fourteenth Amendment to the United States Constitution because the identification procedures used were unfairly suggestive, making it all but inevitable that the victim would identify the defendant whether or not he was the perpetrator of the offense charged.

The United States Supreme Court has delineated factors to be considered in evaluating the likelihood of misidentification. In determining whether an out-of-court identifi-

cation of a criminal defendant is so tainted as to require suppression of an in-court identification, a court must look to the totality of the circumstances, including such factors as "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, (1972). This analysis is so well accepted nationwide that virtually every jurisdiction has adopted it. For a reputable listing of the hundreds of cases discussing this approach, see Shepard's United States Citations, No. 4 Case Edition (Supp. 1971-76); Shepard's United States Citations, (Supp. Jan. 1981); Shepard's United States Citations, (March 1981). We most recently applied this approach in *State v. Demastus,* 165 W. Va. 572, 270 S.E.2d 649 (1980), and have applied it in various other cases. *See, e.g., State v. Foddrell,* 165 W. Va. 540, 269 S.E.2d 854 (1980); *State v. Kennedy,* 163 W. Va. 243, 249 S.E.2d 188 (1978); *State v. Williams,* 162 W. Va. 309, 249 S.E.2d 752 (1978); *State v. Casdorph,* 159 W. Va. 909, 230 S.E.2d 476 (1976). These five areas of inquiry must be examined in light of the record.

(1) *The opportunity of the witness to view the criminal at the time of the crime.* The victim's view of the criminal was limited by darkness, by fears and anxieties arising from the attack upon her, and by the assailant's efforts to obscure her vision of him and of the surroundings. In her initial statement to investigating officers, she observed that "the man was dirty, he stunk . . . he was a fat dude with a big belly . . . wearing a dark blue work shirt . . . . His hair seemed short and stuck up . . . not combed . . . . He had a round face, pudgy nose, no sticky out ears, not flat against head, in between . . . . He had no visible scars, marks, tatoos, or rings that I could see."

The appellant's contention is that it was only after it appeared that the identification procedure was tainted that the victim, upon questioning by the State at trial, revealed that she had had an opportunity to view her

assailant. This argument is belied by the fairly detailed description of her assailant contained in her statement to the police. Moreover, the victim was in physical contact with her assailant and testified at the preliminary hearing that during the time the crime was being committed, "two times I got a very good look at his face."

(2) *The witness' degree of attention.* The witness' lengthy, detailed statement, her testimony at the preliminary hearing, and the fact that she was the victim rather than a disinterested observer, indicates that she was extremely attentive. The record also shows that she was observant of her surroundings in and outside of the automobile and noted the Ohio license tag, the car's color and taillight design.

(3) *The accuracy of witness' prior description of the criminal.* The victim's statement at the hospital quite accurately describes the appellant. The appellant is mistaken in asserting that the victim said that the appellant had a recent crew-cut when, in fact, his hair was somewhat longer. Her statement at the hospital was "his hair seemed short and stuck up . . . not combed . . . ." She later explained that her description of his hair as being a three-to-four-week-old crew cut was the best she could come up with at the time. Moreover, the accuracy of her description of the appellant is supported by the fact that the appellant was identified by an informant after the informant was shown the composite drawing made by the police from the victim's description.

(4) *The level of certainty demonstrated by the witness at the confrontation.* The witness was not certain at the initial confrontation whether the appellant was the person who committed the assault upon her; however, her lack of certainty must be measured by the circumstances of the initial confrontation. Her view of the appellant at the Moundsville Police Headquarters was through a one-way mirror. At that time, the appellant was wearing a hat, was sitting in a chair in the office of the Chief of Police, and was approximately 20 to 25 feet from the witness. She could not hear his voice, and her view of him was not adequate for

134

identification certainty. She testified on the situation as follows:

> I was in another room looking through a mirror. They asked me if that was him. I told them I could not positively identify or I didn't want to positively identify anybody unless I could get a closer look and I would like to hear his voice. He was too far away. I couldn't see him proper and everything else and asked [the officer] if [I] could at least get a better look and hear him speak.

(5) *The length of time between the crime and the confrontation.* The victim's initial view of the appellant occurred on January 6, 1978, eleven (11) days after the alleged assault. At that time, she could not positively identify the appellant as her assailant. On January 17, 1978, she viewed photographs of ten men of comparable physical appearance and identified the appellant's photograph. On January 19, 1978, she actually confronted seven men of comparable physical appearance in a police-arranged line-up. She was close to the men, viewed them from different angles, and heard them speak, voicing a command directed to her by her assailant on the night the crime was committed. Less than one month after the crime, she positively identified the appellant as her assailant.

On September 20, 1978, the first day of the jury trial, the trial court concluded a lengthy evidentiary hearing on the motion of the appellant to suppress the identification testimony of the prosecuting witness. Two witnesses testified at the hearing, the complaining witness and Deputy Sheriff Roy Barker, one of the investigating law enforcement officers. The trial court, in an excellent memorandum opinion, reviewed and considered the identification evidence in the light of the United States Supreme Court's decision in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and the decision of this Court in *State v. Casdorph,* 159 W. Va. 909, 230 S.E.2d 476 (1976), relating to the totality of circumstances test incident to suggestive identifications. The lower court's opinion noted that the complaining witness saw her assailant twice in face-to-face situations in the course of one-half hour during the

commmission of the crime, factors comparable to the facts in *Biggers, supra,* also a rape case. The circuit court noted the observations of the witness at the preliminary hearing, her initial statement to the police relating to the accused's physical appearance, and the level of certainty of her later identification of the accused, and ruled that "her identification meets the test of certainty." The circuit court also observed that the lapse of time between the date of the crime and the positive identification on January 19, 1978, was less than one month, whereas the positive identification of the accused in the *Biggers* case occurred some seven months after the commission of the crime.

We find no error in the trial court's denial of the motion to suppress the testimony of the complaining witness in this case. The factual situation here is vastly different than that in *State v. Kennedy,* 163 W. Va. 243, 249 S.E.2d 188 (1978), the major case relied upon by the appellant, in which the accused was identified by a witness who was forty to sixty feet from the fleeing criminal, did not see the face of the perpetrator, and was concentrating on pursuit of the criminal rather than identification. The complaining witness here was concerned about locating and identifying her assailant. She had earlier aided police in structuring a composite drawing of the man who had attacked her and had ruled out a suspect she had seen in Ohio. She refrained from a hasty identification when she first saw the appellant through a one-way mirror on January 6, 1978, but picked the appellant's picture from a photo array and positively identified him from the line-up. The identification procedures used were progressive and, upon this record, we must conclude that the circuit court did not err in finding the identification reliable and not unfairly suggestive.

## II

The appellant's second assignment of error is that the trial court should have suppressed all evidence obtained from a search of the appellant's car because the appellant's consent to search the car was obtained during "coercive custodial circumstances" and, therefore, was involuntary. The record shows that the appellant signed a consent to search form while in the presence of five law enforcement

officers who informed him of his *Miranda* rights and of his right to refuse to consent to the search of his car.

The trial court, in its memorandum opinion, ruled that "[t]he only coercive circumstances that this court can see is the fact that the defendant was in a room with five police officers at the time the consent to search was signed." This is troubling indeed. Five authority figures, with the power to determine one's immediate liberty, create an imposing, if not overwhelming, show of force. The psychological effect of sitting in a police station with five law officers while a tape recorder memorializes every response might make even the most recalcitrant individual think of compliance. In such a situation, one unschooled in the law may be more inclined to please his interrogators by supplying the responses they seek rather than alienate those who hold the keys to his liberty. One need only be reminded of the quickened pulse and damp palms which result when even the most law-abiding driver views a patrol car in his rearview mirror. We think a serious question of voluntariness arises anytime an individual suspected of criminal conduct is confronted by five authority figures who request compliance with their wishes.

However, upon examining the record, we are unwilling to hold that the consent to search was elicited involuntarily. We note from the record that the appellant had some law enforcement experience, as he was, at one time, a guard at a State penitentiary. Moreover, after giving his written consent for the search, the appellant made no move to withdraw the consent and, upon his arrest several hours later, he turned the keys to his automobile over to the police officers. While the record does reveal some conflict as to whether the appellant was informed that he was a suspect in this sexual assault, he was informed that he was a suspect in another sexual assault which occurred about one and one-half years before this assault occurred. Additionally, all the testimony at the suppression hearing was to the effect that the appellant was not in custody and was free to leave the police station at any time up to his arrest later that day. The record reveals that the appellant did not appear to be under the influence of intoxicants or

drugs and was really most cooperative. Indeed, it was the appellant who requested the line-up.

The trial court, in its memorandum opinion, applied the totality of the circumstances test and determined that the appellant was cooperative with authorities not because he was coerced, but because he wanted to resolve his situation. In denying the motion, the lower court went on to note that the appellant appeared to be of average intelligence and was aware of his surroundings.

The appellant cites *State v. Williams*, 162 W.Va. 348, 249 S.E.2d 758 (1978), where the Court held in syllabus points 1 and 2:

> 1. "Although evidence acquired by consent is admissible against the accused in trial, mere submission to colorable authority of police officers is insufficient to validate a 'consent' search or to legitimatize the fruits of the search, and evidence so obtained is incompetent against an accused." Syl. pt. 8, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974).
>
> 2. "A suspect whose acquiescence to search is secured during police custody occurring by reason of an illegal arrest, or similar form of overt, or subtle detention, is in no position to refuse to comply with the demands of the officer in whose custody he is, whether such demand is couched in the language of a polite request or direct order, and he cannot be held to have consented to the search voluntarily." Syl. pt. 9, *Id.*

Incidental to these holdings is the proposition that some deference must be accorded the trial court's opinion which recognized a disparity in the evidence as to whether the appellant had been informed he was a suspect in this particular case at the time his written consent to search the automobile was given. In *State v. McKinney*, 161 W.Va. 598, 244 S.E.2d 808 (1978), this Court held, in syllabus point 3:

> A consent to search agreement signed by an accused must be treated in the same manner as a confession and the trial court must, even in the

absence of a specific request, determine the voluntariness of such consent before the evidence obtained by the search can be introduced into evidence.

In *State v. Craft*, 165 W. Va. 741, 272 S.E.2d 46 (1980), the Court referred to *State v. Williams, supra,* and to *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and held, in part, at point 8 of the syllabus:

Whether a consent to a search is in fact voluntary or is the product of duress or coercion, express or implied, is . . . to be determined from the totality of all the circumstances.

We cannot conclude from the record in this case that the circuit court erred in denying the motion to suppress the evidence obtained from the search of the appellant's car. The record in this case discloses that the trial court heard ample testimony, some adduced on cross-examination by the appellant, on which to determine the voluntariness of the appellant's consent to search his automobile before any of the products of the search were offered into evidence. Although the circuit court had not been alerted prior to or during the trial that any question would be raised concerning the voluntariness of the appellant's consent to search his automobile, when the question emerged late in the trial on a defense motion to suppress any evidence obtained as a result of the search, the court was prepared to rule on facts detailed in the testimony introduced up to that point. The trial court determined that from the totality of the circumstances indicated by the evidence adduced at that point, the consent to search was voluntarily given and was not the product of duress or coercion and, accordingly, denied the motion to suppress. Later, when the appellant moved the court to set aside the verdict and grant a new trial, the court heard additional testimony on the facts and circumstances concerning the permission to search granted by the appellant and again ruled that the consent to the search was given voluntarily. The record amply supports the lower court's ruling and illustrates that the trial judge carefully and sensitively considered the evidence relating to the consent to search in

light of the rule announced in *State v. Williams, supra,* and applied in *State v. Craft, supra.* We find no error in the circuit court's denial of the motion to suppress and, accordingly, we affirm the lower court's ruling on this motion.

In conclusion, based upon our review of the law and the record in this case, we think the lower court properly admitted the testimony of the complaining witness which identified the appellant as her assailant. The lower court also properly ruled that the appellant's written consent to search his car was sufficient and voluntary, and that the fruits of the search were properly admitted at trial. For the foregoing reasons, the judgment of conviction of the Circuit Court of Marshall County is affirmed.

*Affirmed.*