506 S.E.2d 46

**STATE of West Virginia, Appellee,**

v.

**Charlton A. HORTON, Jr., Appellant.**

**STATE of West Virginia, Appellee,**

v.

**Darnell A. ALLEN, Jr., Appellant.**

Nos. 23892, 23893.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 14, 1998.

Decided June 22, 1998.

12

Lynn A. Nelson, Prosecuting Attorney, Keyser, for State of West Virginia.

Kevin D. Mills, Martinsburg, for Horton.

William B. Kuykendall, Keyser, for Allen.

PER CURIAM: [1]

These consolidated cases are before this Court upon appeal from final orders of the Circuit Court of Mineral County entered on September 12, 1995, and October 4, 1995.[2] The appellants, Darnell A. Allen, Jr., and Charlton A. Horton, Jr., were convicted in separate trials of the offense of murder in the first degree without a recommendation of mercy. On appeal, the appellants challenge the circuit court's denial of their motions to suppress certain evidence and motions for a change of venue. The appellants also contend that the circuit court erred when it

---

1. We point out that a per curiam opinion is not legal precedent. *See Lieving v. Hadley*, 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4 (1992).

2. These cases were originally presented to this Court as separate appeals. On October 9, 1997, we consolidated the cases for purposes of oral argument and decision.

admitted into evidence a video of the crime scene. Finally, appellants assign several errors to their individual trials.

This court has before it the petitions for appeal, all matters of record, and the briefs and argument of counsel. For the reasons discussed below, appellants' convictions are affirmed.

I.

Arthur Samuel Smith, Jr., was beaten to death with a blunt instrument during the early morning hours of January 8, 1994, in Keyser, West Virginia. The police were called to the crime scene around 2:20 a.m. by Robert Martin who witnessed the crime when he looked out the upstairs window of his apartment. Mr. Martin saw two black men in dark bulky coats striking something on the ground with a stick or club near the Lighthouse Assembly of God Church on Virginia Street. When the police arrived, they discovered Mr. Smith's body.

The appellants were taken to the police station for questioning shortly after the crime occurred. They were spotted in the area where the crime had been reported, and they matched the description of the suspects given by the eyewitness. At the station, the appellants gave conflicting statements about where they had been that evening just prior to the crime. After the police found a small piece of body tissue on appellant Allen's cap and a blood stain on appellant Horton's boots, they were arrested and charged with murder.

The appellants were tried separately in August 1995. At both trials, Aaron Delsignore testified that appellant Allen had asked him on the night of January 7, 1994, to borrow a baseball bat that Mr. Delsignore kept in his car. Mr. Delsignore told appellant Allen he could use the bat, and he noticed it was missing the next day.[3] The evidence also revealed that a few months prior to the crime, appellant Allen had made threats against Mr. Smith because Mr. Smith had kissed appellant Allen's teenage sister on the cheek giving her a rash. Appellant Allen was convicted on August 10, 1995, and appellant Horton was convicted on August 25, 1995. The appellants were given life sentences without mercy as reflected in the final orders.

II.

We begin our review by considering those assignments of error raised by both appellants. As their primary assignment of error, both appellants contend that the circuit court should have suppressed as evidence their clothing, the results of the DNA blood tests therefrom, and the oral statements they made to the police officers because their rights under the Fourth and Fifth Amendments of the United States Constitution and Sections 5, 6, and 10 of Article III, of the West Virginia Constitution were violated. The appellants essentially argue that their prolonged detention constituted an illegal seizure thereby rendering the evidence obtained during that time inadmissable. Appellants also contend that the evidence was inadmissable because their clothing was taken without their consent and their oral statements to the police were not voluntary.

We first note our standard of review relating to a motion to suppress. In Syllabus Point 1 of *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996), we stated:

When reviewing a ruling on a motion to suppress, an appellant court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

In Syllabus Point 2 of *Lacy*, we further advised:

In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virgi-

---

3. The murder weapon was never found.

nia Constitution is a question of law that is reviewed *de novo*. Similarly, an appellate court reviews *de novo* whether a search warrant was too broad. Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of law, or, based on the entire record, it is clear that a mistake has been made.

■ We begin our analysis by reviewing the events as they unfolded on the night of January 8, 1994. Initially, the appellants were stopped by Lieutenant William Roy of the Keyser city police as he was on his way to the crime scene. The officer noticed the appellants walking away from the area where the crime had been reported. Because the appellants matched the description of the suspects related by the radio dispatcher, Lieutenant Roy stopped them and asked them where they had been. The appellants told the officer that they had been at appellant Horton's father's house, and they were going to a friend's house on Main Street. With this explanation, Lieutenant Roy told the appellants to go ahead, and he returned to his car. A few minutes later, Lieutenant Roy received a message from one of the officers at the crime scene requesting him to find the appellants for questioning. According to Lieutenant Roy, he found the appellants the second time on Main Street and asked them to come to the station for questioning regarding an altercation.[4] According to Lieutenant Roy, the appellants voluntarily agreed to come to the station, and they got in the backseat of his police car. Upon arrival at the police station, Lieutenant Roy placed the appellants in separate rooms and read them their Miranda rights.[5] Each signed a waiver form at that time. The appellants then waited approximately three hours for the investigating officers to return from the crime scene.

As support for their contention that they were illegally seized, appellants rely upon our holding in Syllabus Point 2 of *State v. Jones*, 193 W.Va. 378, 456 S.E.2d 459 (1995), wherein, we stated:

> If the police merely question a suspect on the street without detaining him against his will, Section 6 of Article III of the West Virginia Constitution is not implicated and no justification for the officer's conduct need be shown. At the point where a reasonable person believes he is being detained and is not free to leave, then a stop has occurred and Section 6 of Article III is triggered, requiring that the officer have reasonable suspicion that criminal activity is afoot. If the nature and duration of the detention arises to the level of a full-scale arrest or its equivalent, probable cause must be shown. Thus, the police cannot seize an individual, take him involuntarily to a police station, and detain him for interrogation purposes while lacking probable cause to make an arrest.

Appellants assert that similar to the defendant in *Jones*, they were taken into custody without probable cause.

■ Clearly, Lieutenant Roy's initial stop of the appellants was permissible. Thus, our focus is on the subsequent alleged detention of the appellants at the police station. In order for the police to take a suspect to the station for questioning, they must have either probable cause or consent. *Jones*, 193 W.Va. at 385, 456 S.E.2d at 466. The pivotal factor in *Jones* was the fact that the defendant was transported to the police station without his consent. *Id.* That factor is absent in this case. Here, the appellants voluntarily agreed to go to the police station with Lieutenant Roy.[6] Moreover, unlike the defendant in *Jones*, the appellants were read their Miranda rights once they arrived at the station. In addition, the appellants were not interrogated during the time that they were waiting

---

4. Lieutenant Roy was unaware that a homicide had occurred. In fact, it appears that Lieutenant Roy never learned that the officers at the scene were investigating a homicide until they returned to the station around 5:30 a.m.

5. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. Lieutenant Roy testified that he never even got out of the car when he approached the appellants the second time. He said that after he asked the appellants to answer some questions at the station, they agreed, and opened the car doors and got in the back seat.

for the investigative officers to return, nor were they restrained.[7] Instead, they merely waited for the officers to return. Accordingly, we do not find that a seizure occurred in this case.[8]

■ Having determined that no impermissible seizure occurred, we next consider whether appellants' clothing was obtained without their consent. We have held that:

Whether a consent to search is in fact voluntary or is the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.

Syllabus Point 8, *State v. Craft*, 165 W.Va. 741, 272 S.E.2d 46 (1980). *See also* Syllabus Point 2, *State v. Buzzard*, 194 W.Va. 544, 461 S.E.2d 50, (1995); Syllabus Point 4, *State v. Worley*, 179 W.Va. 403, 369 S.E.2d 706 (1988), *cert. denied*, 488 U.S. 895, 109 S.Ct. 236, 102 L.Ed.2d 226 (1988).

Lieutenant Roy related how he obtained the appellants' clothing at the appellant's joint suppression hearing. He testified, "I told them I need to take their clothes, the officers needed them for evidence, did they have any objections to that ... I requested [the clothes] and got them with no, no problem." Apparently, the appellants had been at the police station for approximately forty-five minutes when the investigating officers at the crime scene radioed the station and asked Lieutenant Roy to see if he could obtain their clothing. Lieutenant Roy explained that when he made the request, the appellants were concerned about what they would wear if they gave up their clothes. He told them that he would bring them some orange jumpsuits from the detention center.

Lieutenant Roy testified that it took about another forty-five minutes to get the uniforms. He then went back into the rooms where the appellants were, and the clothing exchange was made. Lieutenant Roy stated that neither appellant indicated in any way that he did not want to give up his clothing. In fact, one of the appellant's was wearing a necklace or bracelet, and he asked if it was needed too. Lieutenant Roy advised that he needed that item also because it was a part of the clothing. He said the appellant expressed no problem with giving up his necklace or bracelet.

Appellants contend that this is not a case of consent, but an instance where the accused merely submitted or acquiesced to the authority of the police officer. In such instances, the results of the search would be suppressed. *See* Syllabus Point 1, *State v. Williams*, 162 W.Va. 309, 249 S.E.2d 758 (1978). We disagree with appellants' characterization of the situation. Unlike the defendant in *Williams*[9], the appellants in this case were not subjected to any interrogation prior to the request for their clothing or during the time they waited on the jumpsuits. According to the record, a period of at least forty-five minutes elapsed between the time that Lieutenant Roy initially requested their clothing and the time he obtained the jumpsuits and the appellants changed clothes. The appellants had considerable time to think about whether they wanted to give the officer their clothing. Yet, neither expressed any unwillingness to do so. In fact, one of them asked whether he needed to take off his necklace too. Based upon these facts and considering the totality of the circumstances,

7. As previously noted, Lieutenant Roy was not aware that the officers at the crime scene were investigating a homicide. He had only been told about an assault. As discussed in more detail below, the appellants did have at least two conversations with Lieutenant Roy while they were waiting for the investigating officers. These conversations related to the appellants' clothing. At the suppression hearing, Lieutenant Roy testified that the appellants were cooperative with him the entire time that he was involved in the case. The appellants did not testify at the suppression hearing, nor did they present any. evidence to contradict Lieutenant Roy's testimony.

8. Appellants place great emphasis on the fact that Lieutenant Roy testified that he would not have allowed the appellants to leave the station that night. We find this fact irrelevant because the record indicates that appellants never attempted to leave, nor were they told that they could not leave. *See Jones*, 193 W.Va. at 383 n. 8, 456 S.E.2d at 464 n. 8.

9. In *Williams*, five police officers went to the defendant's home in the middle of the night and questioned him. The defendant then went to the station with the officers where he was treated as if he was under arrest and was asked to empty his pockets. 162 W.Va. at 316, 249 S.E.2d at 763 (1978).

we find that the appellants voluntarily relinquished their clothing to Lieutenant Roy.

▉▉▉▉ We next consider the admissibility of the appellants' oral statements.[10] Appellants contend that their statements were involuntary because they were not informed that the officers were investigating a homicide. Thus, the issue here is not whether the defendants waived their Miranda rights, but whether their statements were the product of mental coercion. In Syllabus Point 2 of *State v. Goff*, 169 W.Va. 778, 289 S.E.2d 473 (1982), we held: "A confession that has been found to be involuntary in the sense that it was not the product of the freewill of the defendant cannot be used by the State for any purpose at trial." In order to determine the voluntariness of the confession, we consider the totality of the circumstances surrounding the statement including the background, experience, and conduct of the accused. *State v. Persinger*, 169 W.Va. 121, 129, 286 S.E.2d 261, 267 (1982). We have also stated that in some instances, failure to inform an accused of the nature of the charge against him may be one factor to consider when determining whether a statement is voluntary. *Goff*, 169 W. Va. at 784, 289 S.E.2d at 477.

At the suppression hearing, it was undisputed that the officers did not inform the appellants that the victim was deceased. However, the appellants were told that the officers were investigating an assault. The appellants also knew from conversations with Lieutenant Roy that the assault had happened recently on Virginia Street. Prior to talking with the officers, the appellants went voluntarily to the police station and willingly gave their clothing to Lieutenant Roy. The appellants had also been read their Miranda rights, and they signed waivers.[11] Additionally, the record suggests that this was not the first time appellants had been subject to police questioning. After considering the to-tality of the circumstances, we cannot find the fact that appellants were not informed of the exact charge against them sufficient to render their statements involuntary. Accordingly, the circuit court did not err in denying appellants' motions to suppress.

▉▉▉ Appellants next cite as error the circuit court's refusal to grant their requests for a change of venue. Both appellants asserted pre-trial publicity as the grounds for their motions. On appeal, appellant Horton claims his case is unique because his trial began just eleven days after appellant Allen's trial concluded. He contends that appellant Allen's conviction was highly publicized in Mineral County, and at least fifteen of the potential jurors were aware of the Allen trial and its outcome.

▉▉▉▉ We review motions for a change of venue under an abuse of discretion standard considering both the pre-trial showing and the actual voir dire of the jury. *State v. Derr*, 192 W.Va. 165, 171, 451 S.E.2d 731, 737 (1994). We have long since held that:

> To warrant a change of venue in a criminal case, there be must a showing of good cause therefor, the burden of which rests upon defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.

Syllabus Point 2, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946). *See also* Syllabus Point 6, *State v. Satterfield*, 193 W.Va. 503, 457 S.E.2d 440 (1995); Syllabus Point 5, *State v. Plumley*, 181 W.Va. 685, 384 S.E.2d 130 (1989). Additionally, in Syllabus Point 3 of *Derr*, we stated: "One of the

---

10. After completing their investigation at the crime scene, Officers Forrest Ellifritz and Karen Shoemaker returned to the police station. Appellants were read their Miranda rights again. The officers questioned the appellants separately going back and forth between the rooms. Appellant Allen told the officers that they had been at appellant Horton's father's house, and they had just left when they were stopped by Lieutenant Roy. Appellant Horton said they were not at his dad's house. He then said, "I didn't kill no man and that's all I've got to say."

11. We do note that appellant Horton refused to sign a waiver after he was read his Miranda rights the second time. Nonetheless, he agreed to answer some questions for the officers.

inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinion that they could not judge impartially the guilt or innocence of the defendant."

The record indicates that the appellants' motions for change of venue were first considered by the circuit court in a joint pre-trial hearing. At that time, the appellants presented several newspaper articles detailing the crime. The appellants also offered the results of a change of venue study completed by a research group on behalf of appellant Horton. The study was completed by calling three hundred residents of Mineral County and requesting that they complete a telephone survey which included questions to determine whether the individuals knew about the crime and exhibited biases against appellant Horton. Although the research group recommended moving the trial, the study's results did indicate that out of the three hundred persons polled, one hundred forty-four persons (forty-eight percent) were potentially unbiased jurors. Based on these facts, the circuit court denied the motions, but did suggest that sixty to seventy-five prospective jurors be called.

The jury voir dire from appellant Horton's trial indicates that several potential jurors were aware of the crime and the outcome of appellant Allen's trial. The court conducted individual voir dire of each prospective juror to ascertain exactly what each person knew about the case. In the instances where a prospective juror was aware of appellant Allen's trial and/or conviction, the individual was asked whether that knowledge would prevent him or her from being objective in considering appellant Horton's case.[12]

Based on the record, we find that the trial court did not abuse its discretion in denying appellants a change of venue. Although the results of the venue study indicated that some members of the community may have already formed opinions about the appellants' guilt, the results also projected that almost half the county's population remained unbiased. Moreover, the jury voir dire from appellant Horton's trial revealed that although some of the prospective jurors had heard or read about appellant Allen's case, they did not have fixed opinions which would prevent them from being impartial. Accordingly, the circuit court did not err in denying appellants a change of venue.

■ Appellants also contend that the circuit court erred in admitting a video of the

---

12. The following is an example of the individual jury voir dire conducted in appellant Horton's case:

[Question by appellant's counsel]: Have you read, or seen, or heard anything about this matter either from T. V., radio, or a newspaper?
[Answer by prospective juror]: That I have.
[Q]: And what form of media have you—
[A]: The newspaper. Cumberland paper.
. . .
[Q]: Okay. So you are aware that Mr. Allen was also charged with this same offense. Is that correct?
[A]: Yes.
[Q]: Are you are aware of the verdict that the jury rendered in that case?
[A]: I think I remember it. Yes.
[Q]: What is that?
[A]: I think it was first degree murder and it was with no mercy—
[Q]: Okay.
[A]:—I think.
[Q]: All right. Now the fact that a jury came back with that verdict in that case, you understand this case is a separate and different case altogether?
[A]: Yes sir.

[Q]: The evidence I tend to believe is different and the State may choose to believe it is otherwise. But nonetheless the evidence in this case will show, you are to base your verdict solely on the evidence that you hear in this particular case alone, nothing else?
[A]: Yes.
[Q]: Can you disregard the verdict in that case or do you think just because Mr. Allen has been convicted of first degree murder without mercy that Mr. Horton should also be convicted with, of that particular offense?
[A]: No.
[Q]: Okay. So you don't, you wouldn't feel compelled as a juror because of maybe the public sentiment here in Mineral County that because one was convicted of first degree murder without mercy that the other one should also be convicted of the same thing?
[A]: No.
. . .
[Q]: Okay. Do you think you could set aside everything you have read and heard about this case, and be a fair and impartial juror in this case, and base your verdict in this case solely upon the evidence that you will hear in this case?
[A]: Yes.

crime scene which was taken by the police shortly after the victim's body was discovered. Appellants assert that the video should have been excluded pursuant to Rule 403 of the West Virginia Rules of Evidence because of its "gruesome" content.[13] The video showed the area where the homicide occurred as well as footage of the victim's body. The record indicates that the video was edited by the trial judge at the request of both the State and counsel for the appellants. The edited version was objected to on the grounds that footage of the victim's body that remained in the edited version would inflame the jury.

 In Syllabus Point 8 of *Derr*, we held that "[t]he admissibility of photographs over a gruesome objection must be determined on a case by case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence." In Syllabus Point 10 of *Derr*, we stated:

> Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse.

The record indicates that after appellant Allen objected to the edited version of the videotape, the trial court then performed the requisite Rule 403 balancing test. The trial court found that the video was relevant because it showed what the lighting was like on the night of the crime. The video was probative to the extent that it allowed the jury to evaluate the ability of the sole eyewitness to

view the crime. The court noted that although the jurors were taken to view the scene in person, the video allowed them to see the area as it was on that night of the crime. The court further noted that it excised much of the footage showing the victim's body. After viewing the tape, we find that the trial court did not abuse its discretion and therefore, did not err in admitting the video.

 We now consider those assignments of error that relate to the individual trials of each appellant. Appellant Allen assigns as error the circuit court's admission of testimony under Rule 404(b) of the West Virginia Rules of Evidence to show plan, premeditation, and motive. At trial, Rebecca Blacks, a neighbor of the victim, testified that sometime during the fall of 1993, she observed appellant Allen standing near the victim's back porch with something hidden under his coat.[14] Ms. Blacks stated that approximately a month later, she observed appellant Allen in the same area and this time she could see a baseball bat under his coat. Ms. Blacks also testified that she spoke with appellant Allen after the incident, and he stated he was looking for Mr. Smith. According to Ms. Blacks, appellant Allen was upset because Mr. Smith had kissed his sister and given her a rash.

David Harrison testified that he was at Ms. Blacks' apartment the second time that she observed appellant Allen outside of Mr. Smith's apartment. Mr. Harrison stated that he watched as appellant left the area and removed a baseball bat from under his coat before getting into a car. Mr. Harrison also testified that he was at a party where appellant Allen said he was "going to get" Mr. Smith.

 Appellant Allen contends that the offered testimony should have been excluded because its probative value was suspect, the alleged events were too remote in time, and undue prejudice resulted. In addition, no

---

**13.** W. Va. R. Evid. 1001(2) treats videotapes like photographs for evidentiary purposes. *See also State v. Walker*, 188 W.Va. 661, 670, 425 S.E.2d 616, 625 (1992).

**14.** Ms. Blacks was unable to recall the specific date that she made these observations. She was certain that the events happened during the pro-football season, and she believed they occurred during November and December 1993.

cautionary instructions were offered to the jury to limit its consideration of the evidence. In *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), we set forth the parameters of Rule 404(b) [15]. In syllabus point 1, of *McGinnis*, we held:

When offered evidence under Rule 404(b) of the West Virginia Rules of Evidence, the prosecution is required to identify the specific purpose for which the evidence is being offered and the jury must be instructed to limit its consideration of the evidence to only that purpose. It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record and the purpose alone must be told to the jury in the trial court's instruction.

In syllabus point 2, we further held:

Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

■■■ The record shows that the trial court held an *in camera* hearing prior to appellant's trial at which time it considered the admissibility of the testimony of Ms. Blacks and Mr. Harrison. The court determined that the events were not too remote in time to be considered as the witnesses testified that they probably occurred in November or December 1993, and the victim was killed in January 1994. The court also found by a preponderance of the evidence that the appellant committed the acts observed by Ms. Blacks and Mr. Harrison. Thus, we find no error with the court's determination that the evidence was admissible under Rule 404(b). Although the trial court failed to give the jury cautionary instructions, that omission does not warrant reversible error in this case. The record indicates that the appellant never requested cautionary instructions on this issue at any time during the trial. Additionally, it appears that the prosecution argued in its closing statement that the testimony of Ms. Blacks and Mr. Harrison showed premeditation, plan and motive on the part of the appellant. Accordingly, we find that the circuit court did not err in admitting the testimony.[16]

■■■ We now consider those assignments of error relating to appellant Horton's trial. Appellant Horton contends that the circuit court erred in admitting appellant Allen's statement into evidence and allowing appellant Allen to appear before the jury and invoke his Fifth Amendment right to remain silent. Initially, the circuit court ruled that

---

**15.** Rule 404(b) provides, in pertinent part:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

**16.** Ms. Blacks and Mr. Harrison were defense witnesses at appellant Horton's trial.

appellant Allen's statement to the police would not be admissible at appellant Horton's trial. However, during his opening statement, appellant Horton's counsel informed the jury that appellant Horton had given an oral statement to the police which was "profoundly different" than the statement given by appellant Allen.[17] Subsequently, the circuit court granted the State's renewed motion to admit appellant Allen's statement.

Appellant Horton argues that pursuant to our decision in *State v. Mason,* 194 W.Va. 221, 460 S.E.2d 36 (1995), appellant Allen's statement should not have been admitted because the Sixth Amendment of the United States Constitution and Section 14 of Article III of the West Virginia Constitution guarantees an accused the right to confront and cross-examine witnesses. In this case, appellant Allen's statement was introduced to show that the appellants gave conflicting stories to the police officers about their whereabouts around the time the crime was committed. Clearly, the statement was not offered for the truth of the matter asserted. In *Mason,* we recognized that statements presented in this context do not implicate the Confrontation Clause. 194 W.Va. at 228 n. 8, 460 S.E.2d at 43 n. 8.

■ With regard to the circuit court permitting appellant Allen to assert his right to remain silent on the witness stand, the record indicates that defense counsel did not object to him appearing before the jury. Moreover, when the court informed the parties that it was going to instruct the jury that Mr. Allen's exercise of his constitutional rights was not evidence and no inferences as to the guilt or innocence of the defendant could be drawn therefrom, appellant Horton objected. Appellant Horton told the court that he wanted the jury to draw some inferences from Mr. Allen's failure to testify. Despite appellant's objection, the court gave the instruction to the jury. Accordingly, we find no merit to either of these assignments of error.

■ Finally, appellant Horton cites as error: (1) comments made by the prosecutor during his opening statement and closing argument; (2) the admission of testimony indicating that he was seen prior to the crime throwing snowballs at a policeman; and (3) the failure of the circuit court to ensure a proper "elements" instruction on the offense charged and a proper "inference" instruction regarding a deadly weapon. Upon review of the record, we find that these assignments of error are not properly before this Court because of appellant's failure to properly and timely object. In Syllabus Point 7 of *State v. Cirullo,* 142 W.Va. 56, 93 S.E.2d 526 (1956), we held: "Failure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." *See also* Syllabus Point 4, *State v. Justice,* 191 W.Va. 261, 445 S.E.2d 202 (1994). Because these assertions do not rise to the level of plain error, we decline to consider them. *See* Syllabus Point 4, *State v. England,* 180 W.Va. 342, 376 S.E.2d 548 (1988).

Based upon all of the above, the final orders of the Circuit Court of Mineral County are affirmed.

Affirmed.

---

**17.** Appellant Horton's counsel further stated, "Mr. Allen's statement was, it wouldn't matter if I told you the truth anyway. Mr. Horton's statement was, I didn't murder no man."