STATE OF WEST VIRGINIA

*v.*

DALE EUGENE BRAGG

(No. 13614)

Decided March 29, 1977.

Rehearing Denied July 1, 1977.

*Preiser & Wilson, John C. Krivonyak, Thomas M. Hayes, Weaver & Troelstrup* for plaintiff-in-error.

*Chauncey H. Browning*, Attorney General, *Richard E. Hardison*, Deputy Attorney General, for defendant in error.

CAPLAN, CHIEF JUSTICE:

This appeal results from a conviction of the defendant, Dale Eugene Bragg, on an indictment charging him

with the premeditated murder of Rebecca Sue Bricker. The jury having recommended mercy, the defendant was sentenced to confinement in the state penitentiary for the rest of his natural life, "with a recommendation of mercy". Upon the denial of the defendant's motion for a new trial this appeal was prosecuted.

Although several errors are assigned as grounds for reversal, the principal assignment is the failure of the court to grant the defendant's motion to suppress his extra-judicial statements. It is urged that such statements were erroneously admitted for the reason that, prior to their utterance, the defendant had not been properly advised of his constitutional rights as defined in *Miranda v. Arizona*, 384 U.S. 436 (1966). We are in agreement with the trial court ruling and affirm.

The defendant's involvement in this case began on August 12, 1973 when he was approached by police officers of the City of Charleston in relation to an alleged child molestation charge. The record discloses that on the above date an eleven-year old child was allegedly molested at a local K Mart Store. Nothing was done at that time, but later that evening when the child and her mother were at Arlan's, another retail store, the latter observed the defendant and called the police. When the police arrived, the mother directed them to the defendant who was still in their sight.

When the police officer approached the defendant about this matter, the defendant indicated that he was aware of the mother's charge but thought that it had been resolved. He then voluntarily accompanied the city police to Arlan's where the mother and child identified him as the offender. The police did not arrest the defendant at that time but asked him if he would accompany them to police headquarters to see if the alleged K Mart incident could be "straightened out". During this cursory investigation, one of the police officers observed that the soles of the defendant's tennis shoes were of similar design as that of the shoe print found at the place where the body of the Bricker girl was found.

The record reveals that the defendant was asked by the police if he would accompany them to the police station to get this matter settled, he having been specifically told that he was not under arrest. The defendant complied with that request. Upon arrival at the station the defendant asked for his "rights" and was again told that he was not under arrest. Two police officers then interrogated the defendant about the K Mart incident and engaged him in a general conversation in relation to his residence, place of work and other matters of that nature.

The young girl who was allegedly molested by the defendant tended to become hysterical when confronted by him so the questioning alluded to above took place in a separate room, out of her presence. She later related to David Tucker, a city detective, the manner in which the defendant accosted her. Detective Tucker then went into the room where Dale Bragg was talking with another policeman and said: "Well, Mr. Bragg, I am charging you with a felony." He testified that he then gave the defendant his Miranda warnings. Each right was read to the accused, after which he was asked if he fully understood such right. Upon receiving an affirmative answer, the next right was read and a like response obtained. According to the testimony in the record, the defendant was fully informed of his constitutional rights as prescribed by *Miranda, supra.* He clearly indicated that he understood what rights he had in the circumstances and chose to answer questions propounded to him.

Questioning of the defendant was then resumed by the two officers. It was during this time that the conversation turned to the Bricker murder. When one of the policemen indicated that he did not know the name of the murdered girl, Bragg volunteered by exclaiming "Becky." At this time the interrogation was unquestionably focused on the Bricker murder and the record reveals that Bragg was again read his "rights."

The defendant was then taken to another room where he was further questioned by Detective Edward Leon-

ard. This officer testified at the suppression hearing but not at the trial. He said that he again gave him his constitutional rights. During this period of questioning Detective Leonard and the defendant engaged in conversation about several matters which included the Bricker murder. Leonard asked him how he got Rebecca out of the house, to which the defendant responded that he carried her out. This testimony was adduced at the suppression hearing, not before the jury. The detective immediately "stopped and explained him his rights." This was at least the fourth time that the defendant was informed of his constitutional rights. Unquestionably this warning related to the Bricker murder.

Leonard testified that during further conversation and questioning, the defendant, in great detail, orally confessed to the killing of Rebecca Bricker. This confession was not taken down by the officer but he left the room and related those happenings to his superior. Thereafter, arrangements were made to have a secretary present for the purpose of taking a written statement from the accused. Two officers were in the room with the secretary and the defendant. One of the officers gave Bragg his Miranda warnings and the latter signed a waiver of rights form. This was the fifth time that the defendant was informed of his rights, at least two of which pertained to the Bricker crime. This statement, in the form of questions and answers, was reduced to writing by the secretary and was signed by the accused. It was this written statement, together with other statements of the defendant alluded to above, that the defendant sought to suppress.

We adhere fully to the principles enunciated in *Miranda, supra,* wherein the Court said: "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." We are of the firm opinion, however, upon a thorough consideration of the voluminous record before us, that such procedural safeguards were afford-

ed the defendant and that any statement used by the prosecution and admitted at the trial was made only after the defendant had been fully informed of his rights and had effectively waived such rights in relation to self-incrimination.

It must be borne in mind that no court has said that an accused cannot confess guilt or that such confession cannot be used as evidence against him at his trial. It has long been held, as expressed in *Miranda, supra,* "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."

What does the record disclose in this regard in the instant case? The defendant was fully informed of his constitutional rights on at least five occasions while at police headquarters. Although one or perhaps two of these occasions related to the child molestation incident, the others related to the Bricker murder. It is undisputed that when the defendant, during a conversation, blurted out the name, Becky, he was immediately informed of his rights. Despite these repeated warnings, he chose to continue.

Certainly, according to the record, there can be little doubt that he was fully informed of his constitutional rights in compliance with the principles of *Miranda, supra,* before he orally confessed and prior to his agreement to make a statement which he knew would be reduced to writing. These were the statements that the jury heard, not those made to officers during prior conversations with the defendant.

The principles enunciated in *Miranda, supra,* and in *Escobedo v. Illinois,* 378 U.S. 478 (1964) are here expressly confirmed. We deem these principles, designed to constitutionally protect those accused of crime, absolutely essential to our concept of justice. The key word is protection—constitutional protection—against a big and sometimes unfairly overwhelming prosecutorial authority. There must be preserved for every accused a standard of fairness.

The tenor of the defense is that the police, in a finely orchestrated effort, lied to, misadvised, deceived, misinformed and lured the defendant into a confession, all of which exhibited extremely unfair treatment of a young man of abnormal intelligence. First, a thorough examination and consideration of the record fails to demonstrate that the police officers had orchestrated any such devious plan, nor does the record reveal abnormal intelligence on the part of the defendant.

Although Dale Eugene Bragg is a young man, there is no evidence that he is of abnormal intelligence. To the contrary, three expert witnesses, a psychiatrist and two qualified psychologists, found the defendant to be a person of average to slightly higher than average intelligence. There is no substance, therefore, in the defendant's contention that by reason of his lack of intelligence or understanding that he was treated so unfairly by the interrogating officers that he was forced to offer incriminating evidence against himself. No interrogation of this nature is perfect, but the record reveals that the defendant was timely and adequately informed of his constitutional rights; that he was never, in any way, mistreated, abused or threatened; and that, over all, he was accorded such treatment as would stand the test of fundamental fairness.

The defendant further contends that the trial court erred in its refusal to grant him a bifurcated trial on the issue of insanity. While the defendant entered a plea of not guilty, he relied also on the defense of insanity. It was the defendant's position, as to the insanity defense, that he was suffering from a mental disease or illness which made him unable to conform his actions to the requirements of the law and that, if he were required to present this defense as a part of his trial on the merits, his entire defense would be prejudiced.

The defendant cites *United States v. Bennett*, 460 F.2d 872 (D.C. Cir., 1972) in support of his position. He concedes, however, that the *Bennett* case involved statutes

which were peculiar to the District of Columbia. The court granted the defendant a new trial in the *Bennett* case but not because of a denial of a bifurcated trial. A new trial was granted for reasons not pertinent here. The court did say however "that the failure to order a bifurcated trial was not reversible error. But with the aid of hindsight it is clear that bifurcation would have avoided significant prejudice to the defense, and we see no reason why Bennett should be denied a bifurcated trial on remand."

It is generally conceded that bifurcation lies in the first instance within the sound discretion of the trial court. A trial court does not abuse its discretion by refusing bifurcation where the defendant does not present a substantial defense both on the merits and on the issue of responsibility. *United States v. Bennett, supra.* Other than the defense of insanity, the defendant in the instant case offered little more than a bare denial of the commission of the crime. He testified to his earlier childhood; his penchant for stealing; his frequent moving from place to place; his environmental problems; and various circumstances that would tend to reflect a troublesome early life. None of these, however, constitute a defense on the merits of the offense charged.

While a bifurcated trial may be a desirable goal, and we do not decide that point, we are not, under the circumstances presented in the case now before us, prepared to say that the failure to order a bifurcated trial was reversible error. We hold that it was not.

A final assignment of error dealt with certain instructions. The state offered instructions which alluded to the capacity of the defendant to appreciate the wrongfulness of his act. Instructions Nos. 7 and 8, offered by the state, contained language that this Court, in *State v. Grimm*, 156 W. Va. 615, 195 S.E.2d 637 (1973), indicated it would approve. It said "We would approve of an instruction to the effect that an accused is not responsible for his act if, at the time of the commission of the act, it was the result of a mental disease or defect causing the

accused to lack the capacity either to appreciate the wrongfulness of his act, or to conform his act to the requirements of the law." Both instructions Nos. 7 and 8 offered by the state contained the phrase "to appreciate the wrongfulness of his act or to conform his conduct to the requirements of the law."

The defendant argues that since there was no issue concerning his appreciation of the wrongfulness of his act, instructions Nos. 7 and 8 should not have included the language "to appreciate the wrongfulness of his act." This Court, in State v. Myers, ___ W. Va. ___, 222 S. E. 2d 300 (1976), gave its approval to the Grimm instruction and further said "and it is error for the trial court to give an instruction on this issue of insanity which imposes a different test or which is not governed by the evidence presented in the case." The record reveals that there was evidence presented by the state concerning the defendant's appreciation of the wrongfulness of his act. Also, this instruction was again tacitly approved in State v. Pendry, ___ W. Va. ___, 227 S.E. 2d 210 (1976). We adhere to the views expressed in Grimm, supra, Myers, supra and Pendry, supra and conclude that the trial court properly submitted instructions Nos. 7 and 8 to the jury.

Defendant assigns as error the refusal of the trial court to instruct the jury as to seven possible verdicts. The court instructed the jury that it could return one of four possible verdicts; 1)guilty of murder of the first degree; 2)guilty of murder of the first degree with a recommendation of mercy; 3)not guilty, and 4)not guilty by reason of insanity. The defendant was indicted for "feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully" slaying Rebecca Sue Bricker. Defendant contends that by the state's "switching" to a felony-murder it was an attempt to relieve itself of the necessity of proving that the murder was "premeditatedly" committed. We are of the opinion that the trial court was correct in the giving of the state's instructions providing for the four possible verdicts.

*W. Va. Code,* 1931, 61-2-1, defines first and second degree murder. The state clearly announced, in its opening statement, its intention to prove that the killing of the Bricker girl occurred as a result of rape, committed by the defendant. It also declared that if it were successful in presenting evidence in support of that charge, it would request the court to instruct the jury as to the possible verdicts it could return. We do not agree that this constituted a material variance from the charge in the indictment, thereby creating a new charge, as contended by the defendant.

That the defendant's argument is without merit is clearly demonstrated by an examination and consideration of *W. Va. Code,* 1931, 61-2-1. Therein murder is defined and the allegations required in an indictment therefor are provided, where pertinent, in the following language: "Murder . . . in the commission of, or attempt to commit . . . rape . . . is murder of the first degree . . . In an indictment for murder . . . it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, wilfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased."

In conformance to the requirements of that statute, the instant indictment charged that the defendant "feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder . . .". Under the statute it is not incumbent upon the state to allege the manner in which the death occurred. If the proof offered by the state showed that the death occurred as a result of the commission of or attempt to commit rape, then the jury, under proper instructions, was supplied with a proper foundation upon which to base its verdict. In this regard, State's Instructions Nos. 3 and 4 fully and properly instructed the jury.

In *Ford v. Coiner,* 156 W. Va. 362, 196 S.E.2d 91 (1972) the Court said: "We therefore find that the indictment which followed the statutory form, and under which ap-

pellant was tried and found guilty, was proper, and that he could be convicted thereunder for murder committed in the commission of robbery or burglary." Such is the instant case—an indictment which followed the statutory form and a conviction for felony-murder. *See also, State v. Bragg,* 140 W. Va. 585, 87 S.E.2d 689 (1955).

The question presented to the jury was whether the defendant was guilty of murder of the first degree, as charged in the indictment. The evidence adduced would support only one of the four verdicts offered in the instructions. It would not support murder of the second degree, voluntary manslaughter or involuntary manslaughter. The defendant was guilty of either murdering the victim in the commission of or attempt to commit rape or he was innocent. The jury found him guilty of murder of the first degree, one of the four verdicts upon which it was instructed. We find no error in that instruction.

The then Chief Justice Berry and Justice Flowers participated in the decision of this case and concurred in the result but left the Court previous to the preparation of this opinion. Justice Wilson, a member of the Court at the time of the decision, deeming himself disqualified, did not participate in the decision of the case and Justices Harshbarger, Miller and McGraw did not participate.

For the reasons herein stated the judgment of the Circuit Court of Kanawha County is affirmed.

*Affirmed.*