STATE OF WEST VIRGINIA

*v.*

CLARENCE E. BOYD

(No. 15026)

Decided July 13, 1981.

*Steven M. Askin,* and *Burke* for appellant.

*Chauncey H. Browning,* Attorney General, *S. Clark Woodroe,* Assistant Attorney General, for appellee.

McGRAW, JUSTICE:

Clarence E. Boyd appeals from his conviction of robbery by force and violence in the Circuit Court of Jefferson County. The appellant has made numerous assignments of error some of which are without merit and therefore, will

not be addressed.[1] The appellant's major assignments of error are: 1) that he was improperly denied a bifurcated trial; 2) that it was error for the trial court to deny his motion for a change of venue; 3) that testimony relating to the identification of the appellant as the perpetrator of the crime should have been excluded; 4) that the State failed to meet its burden of proving sanity beyond a reasonable doubt; 5) that it was error for the trial court to permit a confession to be admitted into evidence; and 6) that the trial court inadequately and improperly instructed the jury on the disposition of an accused who is found not guilty by reason of insanity. Because we agree with the latter two assignments of error, we reverse.

On November 26, 1976 a man entered a booth located at the entrance of a parking lot at the Charles Town racetrack in Jefferson County, and demanded that the attendant, Bonnie Randolph, give him the money she had collected that day from customers using the parking lot. Ms. Randolph refused and a struggle ensued. A racetrack patron, Mr. Syvilia Hyman, who was entering the parking lot in his car at the time, stopped at the booth to pay the parking fee. Hearing noises of a struggle from inside the booth, Mr. Hyman blew the horn of his car, got out of the

---

[1] Because closing arguments were not transcribed below, we are unable to consider the appellant's contention that the prosecutor improperly mentioned other crimes not in issue during his closing argument to the jury. We find the appellant's contention that the State did not prove all the elements of the crime to be without merit, since a close scrutiny of the record reveals that the evidence presented by the State included all the necessary elements of robbery as charged in the indictment. We also find the appellant's argument that the trial court erred by refusing his instruction on petit larceny and battery to be without merit. Although larceny is often a lesser included offense of robbery, see 67 Am. Jur.2d *Robbery* § 6, the facts of this case do not justify an instruction on larceny as a lesser included offense. The appellant argues that the evidence supports an instruction on battery because the jury could have found that the appellant, although not totally insane, lacked the intent necessary to commit robbery. The flaw in this argument is that battery, too, requires intent. Insanity that would negative intent to steal would also negative intent to do battery. Consequently the three verdicts given to the jury—guilty of robbery, not guilty, and not guilty by reason of insanity—were the correct verdicts under the law and the facts of this case.

vehicle, and approached the booth. The thief, hearing the horn, grabbed the metal money box which was sitting beside the door and exited the booth where he found himself confronted by Mr. Hyman. Apparently surprised by Mr. Hyman's presence, the thief stopped for a few seconds, and then ran away from the parking area. Ms. Randolph came out of the booth seconds later stating that a robbery had occurred. Mr. Hyman immediately returned to his car, drove to the racetrack clubhouse and informed racetrack security of the robbery.

Approximately ten minutes later, Ms. Randolph was taken to the racetrack security office where she gave a general description of her assailant to the chief of security. The chief of security then showed her some photographs of persons, who, Ms. Randolph was informed, had been barred from the racetrack. From these photographs Ms. Randolph identified a picture of the appellant, Clarence Boyd, as the man who robbed her.

Approximately half an hour to an hour later Ms. Randolph was shown the same set of photographs by two state police officers who had arrived to investigate the robbery. She again selected the photograph of the appellant as the man who had robbed her. Mr. Hyman was also shown an array of photographs by the state police at this time, and he also selected the photograph of the appellant as the man he saw leaving the booth after the robbery. There is some dispute concerning the number of photographs shown to Ms. Randolph and Mr. Hyman. Ms. Randolph testified at trial that she was shown at least five photographs. Mr. Hyman testified that he was shown seven to nine photographs that evening. The investigating state police officer testified that he displayed only four photographs to both witnesses.

The appellant was indicted on a charge of robbery by force and violence in January of 1977. He surrendered to state police officers at the Jefferson County jail in February, 1978. One of the troopers present when the appellant surrendered testified that he read the appellant his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and then asked the appellant if he

understood his rights. The appellant acknowledged that he did.

The trooper testified that he then handed the appellant a waiver of rights form and requested the appellant to read the first two lines of the form aloud and explain them in his own words. The trooper then directed the appellant to read the remainder of the form silently. When he had finished reading, the appellant signed the waiver of rights form.

The trooper then questioned the appellant concerning the 1976 robbery at the racetrack. As a result of the questioning, the appellant made an oral statement, which was transcribed by the officer, admitting that he was the perpetrator of the robbery. At trial, the state trooper could not remember whether he had read the transcribed statement aloud to the appellant while the appellant followed along, or whether the appellant had read the statement aloud himself. Whichever occurred, the appellant then signed the statement. The appellant spent the night in the Jefferson County jail and was brought before a magistrate the next day for arraignment.

Sometime after he was arraigned and incarcerated, the court ordered a reading level test, an intelligence test, and a psychological evaluation to be performed on the appellant by Mr. Nars Roberts, a psychologist employed by the Eastern Panhandle Mental Health Center. At the same time a psychiatric evaluation of the appellant was conducted by Dr. Hiram Sizemore, a psychiatrist affiliated with the mental health center. These reports were filed with the court, and on September 22, 1978, a motion for commitment was filed by counsel for appellant. Pursuant to this motion, the court ordered that the appellant be admitted to Weston State Hospital for a twenty-day observation period to determine whether he was competent to stand trial. This observation period was later extended at the request of doctors at Weston.

On November 30, 1978 a hearing was held at which the court found the appellant incompetent to stand trial and ordered him to be re-committed to Weston for a period not to exceed six months. After several continuances, a

hearing was held on October 1, 1979 upon the issue of whether the appellant was competent to stand trial or criminally responsible for his actions. The court concluded that the appellant was competent to stand trial, and that whether the appellant was criminally responsible was a matter for the jury to decide.

On January 18, 1980 the appellant's motion for a change of venue was denied, and on January 22, 1980, trial began. At the beginning of trial, appellant made a motion for a bifurcated trial. This motion was also denied. At the conclusion of trial, the appellant was convicted of robbery as charged in the indictment, and was sentenced to fifteen years in the state penitentiary at Moundsville.

# I

The appellant contends that it was error for the trial court to deny his motion for a bifurcated trial. The appellant moved for a bifurcated trial in order to sever his insanity defense from his defense on the merits, reasoning that a unitary trial at which both defenses were presented would be unfair because the insanity defense would imply guilt on the merits. While the appellant concedes that the right to a bifurcated trial lies within the sound discretion of the trial court, *State v. Daggett*, 280 S.E.2d 545; *State v. Bragg*, 160 W.Va. 455, 235 S.E.2d 466 (1977), he contends that the trial court abused its discretion in this case.

In *State v. Bragg*, 160 W.Va. 455, 235 S.E.2d 466 (1977), we held that a trial court does not abuse its discretion by refusing bifurcation where the defendant does not present a substantial defense both on the merits and on the issue of insanity. The *Bragg* decision, as we recently explained in *State v. Daggett*, W.Va. 280 S.E.2d 545 (1981), was based upon *United States v. Bennett*, 460 F.2d 872 (D.C. Cir. 1972), which in turn, relied upon *Contee v. United States*, 133 U.S. App. D.C. 261, 410 F.2d 249 (D.C. Cir. 1969). *Contee* held that bifurcation should normally be ordered whenever a defendant shows that he has a substantial insanity defense and a substantial defense on the merits, either of which would be prejudiced by simultaneous presentation.

Thus, the criteria adopted in *Bragg, supra,* contemplates a two-step inquiry for determining when bifurcation is warranted. When deciding whether a defendant's motion for bifurcation should be granted, the trial court must first examine both the defendant's insanity defense and his defense on the merits to determine whether they are bona fide defenses supported by the facts and the law. If either defense is found lacking, bifurcation should be refused. If, however, both defenses are substantial, the court must then determine the likelihood of prejudice to the defendant which may result if both defenses are presented at a unitary trial.

Each defense must be "substantial", and supported by a proffer of evidence sufficient in quality and quantity to enable the court to rule intelligently on the issue. Consequently where the defense on the merits consists of a bare denial of the commission of the crime, *see State v. Bragg, supra,* or is confined to putting the government to its proof, *see United States v. Greene,* 489 F.2d 1145 (D.C. Cir. 1973); *Parman v. United States,* 130 U.S. App. D.C. 188, 399 F.2d 559, *cert. denied,* 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126 (1968), or where the insanity defense is not supported by competent psychiatric testimony or reports, *see Higgins v. United States,* 130 U.S. App. D.C. 331, 401 F.2d 396 (1968), refusal to order bifurcation is proper.

If, after considering defense counsel's proffer of evidence, the trial court is convinced that the defendant possesses both a substantial defense on the merits and a substantial insanity defense, it must next determine the likelihood of prejudice to the defendant which may result if both defenses are presented together at a unitary trial. In this regard the trial court should inquire into any possible antagonism between the two defenses, and the manner in which they may be inconsistent. The trial court should be mindful of dangers such as those set out in *Holmes v. United States,* 363 F.2d 281 (D.C. Cir. 1966).

> This court has recognized that substantial prejudice may result from the simultaneous trial on the pleas of insanity and "not guilty." The former requires testimony that the crime charged

was the product of the accused's mental illness. Ordinarily, this testimony will tend to make the jury believe that he did the act. Also, evidence of past anti-social behavior and present anti-social propensities, which tend to support a defense of insanity, is highly prejudicial with respect to other defenses. Moreover, evidence that the defendant has a dangerous mental illness invites the jury to resolve doubts concerning commission of the act by finding him not guilty by reason of insanity, instead of acquitting him so as to assure his confinement in a mental hospital. (Footnote omitted).

363 F.2d at 282.

If dangers such as these are present in the situation presented to the trial court, bifurcation should be ordered.

In the case at hand the appellant's defense on the merits consisted solely of the expectation that all of the State's evidence would be deemed inadmissible at trial. This expectation was based on the appellant's objections that the confession offered by the State was procured in violation of the appellant's right to counsel, and that both the in-court and out-of-court identifications of the appellant were tainted by suggestive circumstances. We cannot agree with the appellant's contention that the elimination of evidence by technical objections meets the requirement of a substantial defense on the merits as contemplated by *State v. Bragg, supra,* and *State v. Daggett, supra.* Since the appellant failed to satisfy the first part of our two-step bifurcation test, the trial court did not abuse its discretion when it refused the appellant's motion for bifurcation.

## II

The appellant also contends that the trial court erred in refusing a defense motion prior to trial for a change of venue. At the hearing on the motion, the appellant provided the court with numerous articles that appeared in the *Martinsburg Journal,* the *Spirit of Jefferson Advocate,* and the *Morning Herald,* three newspapers of general circulation in Jefferson County. The articles detailed facts surrounding the robbery charge against the appellant, his

three attempted escapes from the Jefferson County jail, his involvement in an automobile accident in which three individuals were killed and for which the appellant was charged with negligent homicide, another unrelated robbery charge, and the insanity defense presented at his competency hearing. Counsel for the appellant also provided the court with transcripts of all radio broadcasts in the Jefferson County area dealing with the appellant. These broadcasts contained information similar to that contained in the newspaper articles.

In addition to the documentary evidence, the appellant also offered the results of a random telephone public opinion poll conducted by Professor W.J. Brown of the Shepherd College faculty. Dr. Brown testified that in his opinion, based on the results of the poll, as much as 88% of the Jefferson County population would be prejudiced against the appellant for one reason or another. Upon questioning by the court, however, Dr. Brown revealed that only 44% of those polled recognized the appellant's name, and only 14% associated the appellant's name with criminal acts.

West Virginia Constitution, article III, section 14, provides that an accused person may obtain a change of venue "for good cause shown." Our statute relating to changes of venue in criminal cases also provides that "[a] court may, on the petition of the accused and for good cause shown, order the venue of the trial of a criminal case in such court to be removed to some other county." W.Va. Code § 62-3-13 (1977 Replacement Vol.). In *State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978), we recently discussed in what circumstances hostile sentiment against an accused constitutes good cause for removing the case to another county. In *Pratt* we recognized that wide-spread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial.

In summary we held in *Pratt* that "good cause for change of venue means proof that a defendant cannot get a fair trial in the county where the offense occurred because of

the existence of extensive present hostile sentiment." 244 S.E.2d at 230. Hence, our inquiry is not focused on the amount of pre-trial publicity, but on whether the publicity has so pervaded the populace of the county as to preclude a fair trial. Consequently, while it might have been proper under the facts of this case for the trial court to grant the appellant's motion for change of venue, we do not find that it was reversible error to refuse to do so.[2]

### III

The appellant has raised several issues regarding his identification by the witnesses to the robbery. First, the appellant complains that it was reversible and prejudicial error for the trial court to permit two West Virginia state troopers to testify at trial concerning the out-of-court photographic identification made by Mr. Hyman and Ms. Randolph. The appellant bases his argument on two main points: (1) that the photographic array shown to the witnesses was inherently suggestive; and (2) that the troopers' testimony at trial that Mr. Hyman and Ms. Randolph had identified the appellant's photograph as being that of the perpetrator of the crime was hearsay.

The appellant's argument that the photographic identification was inherently suggestive rests chiefly on the fact that two of the four photographs shown to the witnesses did not resemble the defendant. At trial both of the witnesses described the perpetrator of the robbery as a black male with a "short bush" haircut, approximately one and a half inches in length. The perpetrator of the crime was also clean shaven. Yet of the four photographs shown to the witnesses, one depicted a black male with a crew-cut, and one depicted a black male with a mustache. The appellant argues that the fact that two of the photographs shown to the witnesses did not conform to the description of the

---

[2] We note that the individual voir dire of potential jury members conducted by the trial judge in chambers alleviates any fears we may have that the appellant did not receive a fair trial at the hands of an imparital jury. This is not to say that voir dire can or cannot cure the failure of a trial court to order a change of venue when such an order is warranted by the facts. As that issue is not before us here, we offer no opinion as to its resolution.

perpetrator of the crime, coupled with the confusion surrounding the number of photographs shown to the witnesses, and the inability of Mr. Hyman to make an in-court identification of the defendant as the man he saw exit the parking booth, raises serious questions as to the admissibility of the troopers' testimony.

In determining the admissibility of out-of-court identifications we have consistently followed the test of *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *See, e.g., State v. Rickman,* ___ W.Va. ___, 278 S.E.2d 880 (1981); *State v. Williams,* 162 W.Va. 309, 249 S.E.2d 752 (1978); *State v. Kennedy,* 162 W.Va. 244, 249 S.E.2d 188 (1978); and *State v. Casdorph,* 159 W.Va. 909, 230 S.E.2d 476 (1976). Our formulation of the *Biggers* test was set out in *State v. Kennedy, supra,* as follows:

> In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witnesses to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Syl. pt. 1, *State v. Kennedy,* 162 W.Va. 244, 249 S.E.2d 188 (1978), citing Syl. pt. 3, *State v. Casdorph,* 159 W.Va. 909, 230 S.E.2d 476 (1976). Although the test in *Kennedy* is framed in terms of whether an out-of-court identification is so tainted as to require suppression of a subsequent in-court identification, footnote nine of the majority opinion in *Manson v. Brathwaite,* 432 U.S. 98, 106-07, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140, 149 (1977), which clarified the application of the *Biggers* test, indicates that the same criteria should also apply in determining whether the out-of-court identification itself should be suppressed.

Applying the five-factor *Biggers* test to the facts of this case we find that the reliability of the witness' identification outweighs any suggestiveness that may have been inherent in the out-of-court identification procedure. We reach this conclusion based on the following facts: 1) Both Ms. Randolph and Mr. Hyman had an ample opportunity to view the criminal at the scene of the crime. In the close-quarters struggle that occurred in the parking booth it is unlikely that Ms. Randolph could not have seen the criminal's face even if she had so desired, and Mr. Hyman testified that the criminal froze for approximately five seconds after exiting the booth, at which time he had a sufficient opportunity to view the criminal's face. 2) The attention of both witnesses was focused directly upon the criminal at the time of the robbery. 3) Ms. Randolph described the criminal by body weight, height, hair style, and facial scars. The record does not reveal whether Mr. Hyman gave a description of the criminal prior to being shown the photographs. 4) Both witnesses selected the photograph of the appellant without hesitation and definitely identified the man in the photograph as the perpetrator of the robbery. 5) The photographic identification took place in close time proximity to the offense. Ms. Randolph first identified the appellant's photograph within ten minutes of the robbery. Approximately half an hour later she repeated the identification, at which time Mr. Hyman also identified the photograph of the appellant.

When these indicia of reliability are weighed against the possibly suggestive procedure of showing the witnesses four photographs, two of which depicted suspects with different hairstyles than the appellant's, the scales tip towards the reliability of the out-of-court identification. As we noted in *State v. Kennedy, supra,* "suggestive procedures *alone* should not be the basis of excluding an otherwise totally reliable identification. . . ." 249 S.E.2d at 190 (emphasis in original).

The inability of Mr. Hyman to make an in-court identification of the appellant and the conflicting testimony concerning the number of photographs shown to the witnesses is insufficient to shake our conclusion that the

photographic identification was reliable. The robbery in the case at hand took place in November, 1976, and the appellant was not brought to trial until January, 1980. This lapse of more than three years between the time of the offense and the time of trial adequately accounts for the discrepancy in testimony concerning the number of photographs viewed by the witnesses and the inability of Mr. Hyman to identify the appellant in court. When weighed against an identification that took place within an hour of the crime these two complaints of the appellant dwindle in proportion.

The appellant also contends that the state troopers' testimony regarding his photographic identification by Ms. Randolph and Mr. Hyman should have been excluded as hearsay. The appellant relies on the decision of the Supreme Court of Louisiana in *State v. Jacobs*, 344 So.2d 659 (La. 1977) as authority for his assertion. In *Jacobs* the admission into evidence of third party testimony concerning a pre-trial identification was deemed reversible error where the identifying witness did not identify the defendant at trial and was not even asked about the pre-trial photographic identification. The court in *Jacobs* held that "the state may not bolster its case with an inadmissible extra-judicial identification when the identifier has not testified that she made such a pre-trial identification." *State v. Jacobs, supra* at 662. In the appellant's case, however, both identifying witnesses testified at trial that they had made a pre-trial photographic identification of the appellant. The appellant's reliance on *State v. Jacobs, supra,* is therefore misplaced.

The underlying rationale of the hearsay rule is to prevent the admission into evidence of unreliable or untrustworthy evidence. The major vehicle through which trustworthiness of evidence is guaranteed is cross-examination. *See, e.g., Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Since both Mr. Hyman and Ms. Randolph testified at trial that they had made a pre-trial identification of the accused, and were at that time subject to cross-examination, the reliability of the

state troopers' testimony is assured and the rationale for excluding such testimony as hearsay disappears.

Accordingly, when the identifying witness testifies at trial concerning a pre-trial identification, we believe the better view is to treat third party testimony regarding the identification as original evidence corroborative of the identifier's testimony.[3] The third party testimony is not hearsay under these circumstances because it is not offered to prove the truth of the matter asserted, but rather is offered as circumstantial evidence supporting an inference that the identifier's testimony is credible. Therefore, we hold that the trial court properly overruled the appellant's hearsay objection to the admission of the state troopers testimony regarding the pre-trial identification of the appellant by Ms. Randolph and Mr. Hyman.

The second issue the appellant raises with respect to witness identification is that it was error for the trial court to permit Ms. Randolph to make an in-court identification of him. This argument is based on the appellant's contention that Ms. Randolph was able to identify the appellant at trial as a result of the suggestive photographic array that she was shown twice the evening of the robbery and as a result of a suggestive show-up that occurred at a preliminary hearing for a co-defendant in March, 1978. We have already analyzed the circumstances surrounding the photographic identification of the appellant by Ms. Randolph and determined, in light of the criteria of *Neil v. Biggers, supra,* that the reliability of the identification outweighed any suggestiveness that may have been inherent in its procedure. Thus, the only issue for our consideration at this point is whether the suggestiveness of the pre-trial show-up so tainted Ms. Randolph's in-court identification as to require its suppression.

---

[3] There is a split of authority on the issue of whether third party testimony regarding an extra-judicial identification of a criminal defendant is admissible at trial. *See, Annot.* 71 A.L.R. 2d 449, § 13. However, the approach we have adopted reflects both the approach taken by the drafters of the Federal Rules of Evidence, Fed. R. Evid. 801(d), and the trend of recent state court decisions. *See* 5 A.L.R. 2d Later Case Service 1225-28.

The show-up referred to by the appellant occurred when Ms. Randolph was subpoenaed to testify at the preliminary hearing of a co-defendant alleged to have assisted as a lookout in the robbery at the racetrack.[4] The appellant, unrepresented by counsel, was also present at the hearing, affording Ms. Randolph the opportunity to view him and hear his name called as one of those involved in the robbery.

In *State ex rel. Patterson v. Gwinn,* No. 14392 (W.Va. May 29, 1979) we discussed this precise issue in the context of a habeas corpus proceeding. In that case we held that the prosecution cannot buttress its case-in-chief by introducing evidence of a pretrial identification made in violation of an accused's Sixth Amendment right to counsel, citing *Moore v. Illinois,* 434 U.S. 220, 54 L.Ed.2d 424, 98 S.Ct. 458 (1977). Even where the accused's right to counsel is not violated, an unduly suggestive line-up can be attacked on due process grounds, and where the defendant attacks the sufficiency of an in-court identification by showing that there was an impermissibly suggestive pre-trial indentification procedure, the in-court identification should be excluded unless the prosecution establishes by clear and convincing evidence that the in-court identification was based upon observations of the suspect other than the line-up identification. *State ex rel. Patterson v. Gwinn, supra.*

Since the prosecution did not attempt to buttress its case by presenting evidence of any identification which may have occurred at the preliminary hearing, no violation of the appellant's Sixth Amendment right to counsel took place below. Nevertheless, the pretrial showup must still be considered in determining whether, under the totality of circumstances, Ms. Randolph's in-court identification was constitutionally impermissible on due process grounds.

---

[4] The appellant also complains of two inadvertant confrontations between Ms. Randolph and the appellant that occurred at the courthouse prior to trial. Neither of these confrontations can be deemed prejudicial to the appellant, however, since Ms. Randolph's testimony indicates that on neither occassion did she have the opportunity to view the appellant's face.

*State ex rel. Patterson v. Gwinn, supra.* Here, as in our inquiry concerning the admissibility of the state trooper's testimony about the photographic identification, we must focus on the reliability of the witnesses' identification, for "reliability is the linchpin" in determining when a suggestive out-of-court identification will so taint an in-court identification as to require its exclusion. *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2243 (1977).

There are two aspects of the encounter in the present case which lead us to conclude that it was unnecessarily suggestive. First, the judicial setting of the encounter strongly suggested to Ms. Randolph that the appellant had been accused of the robbery at the racetrack. Second, the mention of the appellant's name at the hearing specifically identified him as a suspect in the robbery. However, despite the suggestive show-up, we remain convinced that Ms. Randolph's in-court identification was nonetheless reliable. We need not here reiterate our conclusion with regard to the five factors of the test in *Neil v. Biggers, supra.* Suffice it to say that under the totality of the circumstances we believe that the prosecution met its burden of showing by clear and convincing evidence that Ms. Randolph's in-court identification was based on observations of the suspect other than at the suggestive out-of-court confrontation.

The appellant's final argument in relation to the identification issue raised at trial is that it was reversible error for the trial court to refuse his motion for an in-court lineup. We disagree. Our most recent opinion dealing with the right of a defendant to compel an in-court lineup is *State v. Watson*, 164 W.Va. 642, 264 S.E.2d 628 (1980). In *Watson* we declined to adopt the view that a defendant-compelled lineup should be considered separate from normal identification questions. Rather, we held that when the defendant raises the issue of suggestive identification procedures, the proper course for the trial court is to conduct an *in camera* hearing in line with the requirements of *State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978), and then apply the identification test of *Neil v. Biggers, supra*, as set out in *State v. Williams*, 162 W.Va. 309, 249 S.E.2d 752

(1978). If, after applying the test, the trial court finds that there is "a distinct possibility of misidentification, it *may* direct that the defendant be accorded a lineup. . . ." *Watson, supra,* at 632 (emphasis added).

As indicated by the above language from *Watson,* the granting of a defendant's motion for a pretrial lineup is normally within the discretion of the trial judge. In *Watson* we also intimated that one of the factors to be considered by the trial judge in granting the motion is whether the motion is made sufficiently in advance of trial to enable arrangements for it in the event it is granted. 264 S.E.2d at 632.

In the present case an *in camera* hearing was held to determine the admissibility of the State's identification evidence. At the conclusion of the hearing the trial court determined that, under the facts presented at the hearing, the State had met its burden of showing that the witnesses' ability to identify the appellant was not the result of suggestive pretrial confrontations. It is obvious from the record that the trial court did not feel that a distinct possibility of misidentification existed. It also appears that a factor in the court's decision to deny the motion was its untimeliness. One day prior to its denial of the appellant's motion, the court indicated its willingness to permit an in-court lineup. Yet defense counsel failed to make arrangements for a lineup on the day of trial when he made his motion. This undoubtedly affected the trial court's decision.[5] We are consequently unable to conclude that the trial court abused its discretion by denying the appellant's motion for an in-court lineup.

---

[5] The record reveals the following exchange between the trial court and defense counsel:

COUNSEL: "I would like—before she makes an in Court identification, I I would like to have the opportunity when we enter to with a lineup of persons from the jail."

COURT: "Have you arranged for such a line up?"

COUNSEL: "No, sir."

COURT: "Motion's denied."

Transcript pp. 516-17.

## IV

The appellant also contends that it was error for the trial court to admit his confession into evidence because the State failed to prove a knowing and voluntary waiver of the appellant's right to counsel and of his rights to be free from self-incrimination and to remain silent. At the suppression hearing, the appellant introduced the testimony of a clinical psychologist who testified that the appellant had an I.Q. of 58 and a reading level of 2.7 (seventh month of the second grade). Based on tests administered in June 1978, it was the expert's opinion that the appellant could not have read and understood the waiver of rights form which he signed prior to making his confession. The expert offered conflicting testimony on the issues of whether the appellant could understand his *Miranda* rights if they were read to him, at one point testifying that he could, and at another point testifying that he could not.

The appellant also presented the testimony of a psychiatrist, who was of the opinion, based upon his examination of the appellant, that the appellant was retarded with an I.Q. of 79, and in addition was suffering from a mental disease, organic brain syndrome with drug or poison intoxication. The psychiatrist further testified that there was an overwhelming likelihood that the appellant was suffering from the mental disease on the date of his confession and that the combined effect of the retardation and the mental disease would have rendered the appellant incapable of understanding his constitutional rights when read to him, or of understanding the purpose and consequences of a confession.

In rebuttal the State offered the testimony of the two state police officers who were present when the appellant confessed. They testified that prior to confessing, the appellant was read his *Miranda* rights, that he acknowledged that he understood them, and that he read aloud the first two lines of the waiver of rights form which dealt with an accused's right to remain silent, and then explained to the officers the meaning of what he had read.

At the outset we note that in order for a waiver of constitutional rights to be effective it must be knowing and voluntary. Consequently, confessions elicited by law enforcement personnel from criminal suspects who because of mental condition cannot knowledgeably and intelligently waive their rights are inadmissible. Syl. pt. 1, *State v. Hamrick*, 160 W.Va. 673, 236 S.E.2d 247 (1977). Even in the absence of psychiatric testimony that a criminal defendant was incapable of waiving his rights at the time a confession was made, courts must presume that a defendant did not waive his rights, and the prosecution's burden of overcoming this presumption is great. *See, e.g.*, *State v. Mollohan*, ____ W.Va. ____, 272 S.E.2d 854 (1980). When, in addition to this judicial presumption, the defendant also offers evidence indicating that he was mentally incapable of understanding his rights or of appreciating the consequences of a confession, the State's burden of proving a knowing and voluntary waiver becomes great indeed.

Upon review of the circumstances surrounding the alleged waiver, and upon consideration of the expert testimony below, we find that the State did not meet its burden in this case. The appellant's expert witnesses clearly established that the appellant could not have knowingly and voluntarily waived his rights. Their testimony reveals a mildly retarded individual with a reading level comparable to a child in the seventh month of the second grade, who, in all reasonable likelihood, was also suffering from a mental disease at the time his confession was given. In the absence of any countervailing testimony on the part of the State regarding the appellant's mental condition at the time of the confession, we must conclude that the admission of the confession into evidence was prejudicial error.[6]

---

[6] In *State v. Milam*, 163 W.Va. 752, 260 S.E.2d 295 (1979), we declined to hold that the State must produce psychiatric testimony to show that a defendant was sane at the time he gave a confession. We do not disturb that holding here. Whether lay testimony is sufficient to carry the State's burden of proving that a confession was knowingly and voluntarily made when the defendant raises the issue of mental

## V

After two hours of deliberation the jury returned with two questions for the court: (1) would institutional care be available for the appellant if incarcerated; and (2) if a verdict of not guilty by reason of insanity is reached, will he go free? The trial court answered the first question by stating that institutional care would be available if the appellant were incarcerated. In answer to the second question the court summarized the involuntary commitment procedure contained in W.Va. Code §§ 27-6a-3 (1980 Replacement Vol.), and 27-5-1 *et seq.*, (1980 Replacement Vol. and Cum. Supp. 1980), and recited a portion of the appellant's psychiatric report from Weston State Hospital which stated that the appellant was no longer in need of care and treatment.[7]

---

competence, will depend upon the facts of the particular case.

In *Milam*, we also held that the voluntariness of a confession need only be established by a preponderance of the evidence, and that this same standard applies when the defendant challenges the voluntariness of his confession on the grounds of insanity. This standard we also leave intact, but with the recognition that whenever the waiver of constitutional rights is involved the burden upon the State is indeed heavy.

[7] This is the text of the trial court's instruction:

COURT: "If a person suffers from—is suffering from a mental disease and at a time when he's in the (a) West Virginia prison, the Superintendent of Institutions, who runs the prison, can order him sent to such institution or institutions as may be necessary to secure treatment for him. So, in—the answer to the first question is, "Yes". The second question, "If a verdict of not guilty by reason of insanity is reached, will he go free?" And I'll answer that by telling you what would ensue in the event (such) a verdict is reached by you. Before telling you of this, I wish to admonish you of this, the question of punishment is solely in the discretion of the Court and not the jury. It is not for you to consider in reaching your verdict of guilt or innocence. And, not, going on to what could happen if you reached such a verdict; the Court of record may order that a person who has been found not guilty by reason of mental illness, mental retardation or addiction be hospitalized to—in a mental health facility for a period of not—not to exceed forty days for observation and examination. During the observation period of a person found not guilty of any crime by reason of mental illness, mental retardation or addiction procedures for civil commitment may be initiated before the Court having jurisdiction pursuant to another part of the Code. Now, if a civil

The appellant contends that the trial court's instruction did not accurately reflect the law as required by *State v. Milam*, 159 W.Va. 691, 226 S.E.2d 443 (1976), and that the statement by the court that doctors at Weston felt the appellant no longer required treatment, deprived him of a fair trial. We agree.

There are three major defects in the action taken by the trial court. First, the court's instruction neither adequately nor accurately specifies the procedure for involuntary commitment and discharge of a criminal defendant who has been found not guilty by reason of insanity. Every instruction must correctly state the law. *See, e.g., Paxitt v. Sterling Veneer Co.*, 68 W.Va. 438, 69 S.E. 985 (1910). Therefore an instruction which attempts to explain under what circumstances a criminal defendant who has been involuntarily committed to a mental institution subsequent to a verdict of not guilty by reason of insanity may be discharged from the mental institution must include an explanation of the law relating to commitment and discharge of involuntary patients at state mental institutions.

Under our statutes relating to the commitment of criminals, the court may order that a person who has been found not guilty by reason of mental illness, retardation or addiction be hospitalized in a mental health facility for a period not to exceed forty days for observation and examination. During the observation period procedures for

---

commitment proceeding is instituted and a Defendant is committed, he may be discharged. In the event that there is a hearing held by the Court and there is a finding that his discharge is warranted, a proposed discharge of a person found not guilty by virtue of insanity has to have notice—notice of—notice has to have been given of such a hearing to the Prosecuting Attorney of the County. And the Court advises you in this case that the record indicates that the defendant has received prior care and—as has been stated to you by his Counsel, at Weston State Hospital and the authorities out at that hospital stated that, "Defendant is no longer in need of care and treatment and it is respectfully recommended to the Court he be brought to trial and face the charges." That's the answer to your question(s). You may retire to deliberate.

Transcript pp. 1183-85.

civil commitment may be initiated before the court having jurisdiction over the individual. The prosecuting attorney of the county within which the crime occurred must be notified of any hearing, conducted within five years of the alleged crime, relating to commitment of the individual, and shall have a right to be heard at any such hearing. W.Va. Code § 27-6A-3.

In order for the individual to be committed, the court must make a finding that the individual is mentally ill, retarded or addicted and as a result is likely to cause serious harm to himself or to others if allowed to remain at liberty.[8] The court must also find that there are no less restrictive alternatives than commitment appropriate for the individual. W.Va. Code § 27-5-4(j). Once these findings have been made, the court may order the individual to a mental health facility for an indeterminate period, or for a temporary observatory period not exceeding six months. W. Va. Code § 27-5-4(k).

If the order is for a temporary observation period the court, at any time prior to the expiration of the period, may hold another hearing on the basis of a report by the chief medical officer of the mental health facility where the patient is confined, to determine whether the original order should be modified or changed to an order of indeterminate hospitalization. At the conclusion of the hearing, the court shall order indeterminate hospitalization or dismissal of the proceedings. W.Va. Code § 27-5-4(k) (3).

An order for an indeterminate period expires of its own terms at the expiration of two years, unless prior to the expiration, the Department of Health, upon findings based on an examination of the patient by a physician or a psychologist, extends the order for indeterminate hospitalization. W.Va. Code § 27-5-4(k) (4).

An involuntarily committed patient cannot be discharged unless the chief medical officer of the mental

---

[8] This standard does not require that the likelihood of harm be imminent. There need only be a showing that there is a substantial risk of harmful conduct within the reasonably forseeable future. *Hatcher v. Wachtel,* 165 W.Va. 489, 269 S.E.2d 849 (1980).

hospital facility where the patient is confined makes a determination that the conditions justifying involuntary hospitalization no longer exist, or that the individual can no longer benefit from hospitalization. W.Va. Code § 27-7-1 (1980 Cum Supp.). Therefore, in order for the individual to be released, either at the expiration of the temporary observatory period, or at the expiration of the indeterminate period, there must be a showing, based on the sworn testimony of the examining physician or the chief medical officer of the mental health facility, that any likelihood of the defendant causing serious harm to himself or to others if allowed to remain at liberty no longer exists.[9]

---

[9] It is generally held in statutory actions for the release of a person committed to a mental institution after acquittal of a criminal offense by reason of insanity, that the burden of proving eligibility for release rests on the person seeking release. *See, Annot.* 95 A.L.R. 2d 54, 106-08 (1964) and cases cited therein.

It has also been held that one who has been committed after an acquittal of a criminal offense by reason of insanity, is required to establish his eligibility for release by more than a mere preponderance of the evidence. *In Re Dubina,* 311 Mich. 482, 18 N.W.2d 902 (1945) (stronger showing required by one acquitted of criminal offense by reason of insanity); *Re Palmer,* 26 R.I. 486, 59 A. 746 (1904) (clear and strong preponderance of evidence); *People ex rel. Thaw v. Lamb,* 118 N.Y.S. 389 (1909) (degree of reasonable certainty); *Ragsdale v. Overholser,* 281 F.2d 943 (D.C. Cir. 1960) (beyond a reasonable doubt). We agree with the basic reasoning of these cases that people who have committed acts forbidden by law, who have obtained verdicts of not guilty by reason of insanity, and who have been committed to a mental institution subsequent to their acquittal are in a different category than persons who have somewhat similar mental conditions, but who have not committed criminal offenses or obtained verdicts of not guilty by reason of insanity. This is especially true where the offense involves a crime of violence against persons or property. It is therefore reasonable to assume that an involuntary patient with a history of such criminal offenses must bear a greater burden of proving that he is no longer likely to cause serious harm to himself or others than an involuntary patient without such a history.

We do not, however, intend by this languange to subject an individual who has been involuntarily committed subsequent to a verdict of not guilty by reason of insanity to a more stringent standard of release than other involuntary patients. Such a rule would be in violation of the holding in *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). Rather, the standard for release for both types of patients remains the same, *i.e.* they must both make a

Furthermore, no person committed to a mental health facility subsequent to a verdict of not guilty by reason of insanity, shall be discharged unless the physician in charge gives notice to the committing court and to the prosecuting attorney of the county where the crime occurred. If the court objects to the discharge of the individual, a hearing shall be held at which it must be shown that the individual is not likely to cause serious harm to himself or to others if allowed to remain at liberty, in order for the individual to be discharged. W.Va. Code § 27-6A-4 (1980 Replacement Vol.).

The trial court's instruction neither adequately nor accurately set out these procedures and standards. For example, the only time period mentioned in the trial court's instruction is the forty day observation period contained in W.Va. Code § 27-6A-3. Another major defect is the conspicuous absence of any discussion concerning our statutory standards for involuntary commitment or subsequent release. The instruction was therefore defective and should not have been given.

The second defect in the trial court's instruction occurred when the court read the excerpt from the doctor's report regarding the appellant's competency to stand trial. We find the inclusion of this excerpt to have been needlessly and impermissibly prejudicial. In *State v. Milam, supra,* we expressed the fear that an instruction such as that at issue could unnecessarily prejudice a defendant, and that the prejudice which might result from such an instruction should be considered as a factor before it is given to the jury. We find in the facts of this case a justification of that fear.

From the nature of the jury's second question, one could validly conclude that the jury was seriously considering a verdict of not guilty by reason of insanity. However, the trial court's answer, by specifying only the forty day

---

showing that they are no longer likely to cause serious harm to themselves or to others if released. We merely recognize that when the patient has a history of criminal offenses, it may be more difficult for him to satisfy the required standard.

observation period and by including the statement from the doctor's report that the appellant was "no longer in need of care and treatment", obviously implied that if the jury were to return with that verdict, the appellant would be free and walking the streets within forty days. In addition to its speculative nature, this implication is patently prejudicial to the appellant.

Third, the trial court erred by failing to provide the appellant with an opportunity to offer an instruction in response to the jury's question. We recently held that a criminal defendant, as a matter of right, is entitled to an instruction which advises the jury about his further disposition in the event of a finding of not guilty by reason of insanity. *State v. Daggett*, ___ W.Va. ___, 280 S.E.2d 545 (1981); *State v. Nuckolls*, ___ W.Va. ___, 273 S.E.2d 87 (1980). However, the court below failed to provide defense counsel with an opportunity to offer an instruction of his own in response to the jury's question, or to object to the court's instruction before it was given, a right which we find implicit in the holdings of *Daggett* and *Nuckolls*.[10] Therefore, we must agree with the appellant's contention that the giving of this instruction, especially in light of its inaccuracy and prejudicial effect, constituted reversible error.

## VI

In support of his insanity defense the appellant presented the testimony of two psychiatrists and one psychologist, all of whom were of the opinion that on the date of the offense the appellant was suffering from a mental disease or defect, and, as a result, was unable to appreciate the wrongfulness of his conduct or conform his conduct to the law. In rebuttal the State offered the testimony of a psychologist who stated that although the appellant was mildly retarded, he showed no signs of psychosis or mental disease when examined in June of 1978,

---

[10] Our new proposed rules of criminal procedures reinforce the *Nuckolls* holding by providing that supplemental jury instructions must be in writing, and may not be given to the jury until the parties have been accorded an opportunity to object thereto. Proposed W.Va. R. Crim. P. 30.

and consequently, was probably not brain damaged prior to that time. The State also offered the testimony of a jailer at the Jefferson County jail who testified that the appellant exhibited normally quiet, average behavior when incarcerated between 1978-1980.

The appellant contends that because the State failed to offer any evidence regarding the criminal responsibility of the appellant at the time of the offense, it failed to carry its burden of proving sanity beyond a reasonable doubt as required by *Edwards v. Leverette*, 163 W.Va. 571, 258 S.E.2d 436 (1979), and therefore the trial court's failure to direct a verdict of not guilty constituted error.[11]

There exists in the trial of an accused a presumption of sanity. Once the accused offers evidence of his insanity, however, the presumption disappears, and the burden falls upon the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time of the offense. *Edwards v. Leverette*, 163 W.Va. 571, 258 S.E.2d 436 (1979). It is impossible to fashion a general rule that specifies the nature and quantity of evidence which the prosecution must produce to prove sanity beyond a reasonable doubt; this issue must be resolved according to the facts and circumstances of the particular case. *State v. Milam*, 163 W.Va. 752, 260 S.E.2d 295 (1979).

---

[11] On appeal the state contends that the insanity defense offered by the appellant is without merit and should be striken under the proposition that voluntary drug intoxication is no defense to a criminal act. Although we agree that voluntary drug intoxication is no defense to a criminal act, *see, Annot.*, 73 A.L.R.3d 98, we fail to see how that rule applies to the facts of this case.

There is a distinction to be made between the criminal responsibility of an individual who is *intoxicated* at the time of the offense, as a result of the voluntary use of drugs, and an individual who is suffering from a *mental disease* at the time of the offense caused by the long-term voluntary use of intoxicating drugs. The law in this State is that a defendant will not be deemed criminally responsible if, at the time of the offense, he is suffering from a mental disease or defect to such an extent that he cannot appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law. *State v. Grimm*, 156 W.Va. 615, 195 S.E.2d 637 (1973). The origin of the disease or defect is irrelevant for purposes of this rule.

Although the rebuttal testimony of the State on the issue of the appellant's sanity was not framed in terms of criminal responsibility, it is clear that the State's expert was of the opinion that the appellant was not suffering from a mental disease at the time of the offense. From this the jury could infer that at the time of the crime, the appellant was criminally responsible for his actions. This is not the situation we were presented with in *State v. Milam, supra.* In that case the State failed to offer *any* evidence to sustain its burden of proving sanity. Here the State offered the testimony of a competent expert who had examined the appellant and determined that he was not suffering from a mental disease at the time of the examination or prior to that time. Such testimony constitutes a sufficient foundation upon which the jury could base a conclusion that the appellant was sane at the time of the offense. Consequently, the trial court was correct in permitting the issue of the appellant's sanity to go to the jury.

In summary, because the State failed to prove that the appellant's confession was predicated upon a knowing and voluntary waiver of rights, and because the trial court failed to adequately or accurately instruct the jury on the disposition of a criminal defendant in the event of a jury finding of not guilty by reason of insanity, the verdict of the Circuit Court of Jefferson County is reversed and remanded for proceedings consistent with this opinion.

*Reversed and remanded.*